IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | 1:09-CR-551-WSD |
| EDGAR VALDEZ-VILLAREAL<br>AKA LA BARBIE<br>AKA JUEDO | |

## Government's Sentencing Memorandum

The United States of America, by Byung J. Pak, United States Attorney, and Elizabeth M. Hathaway and Garrett L. Bradford, Assistant United States Attorneys for the Northern District of Georgia, files this sentencing memorandum and requests that Edgar Valdez-Villareal be sentenced to a term of imprisonment of 660 months and ordered to forfeit a sum of $192,000,000.

Valdez was a drug trafficker of the highest magnitude. Starting from humble roots in Laredo, Texas, he worked his way up to become a top-level enforcer and trafficker for the Sinaloa, and later Beltran-Leyva cartels. Known for his flashy lifestyle, Valdez earned millions of dollars by selling thousands upon thousands of kilograms of cocaine in the United States. As the amount of cocaine trafficked by Valdez is staggering, the brutality of his operations is disquieting. As discussed below, Valdez is credited for starting a war with the Zetas to wrestle control of the lucrative Laredo corridor to further his criminal enterprise, leaving untold carnage behind.

Valdez's reign came to a crashing halt on August 30, 2010, when he was arrested by Mexican Police at a ranch he owned near Mexico City. Valdez was subsequently extradited to the United States, where he pleaded guilty to drug trafficking and money laundering charges. Defendant is scheduled to be sentenced by this Court on June 11, 2018.

## 1. Factual Background

### A. The Early Years

Valdez, a United States citizen, was born and raised in Laredo, Texas. At age 18, he was arrested for criminal negligent homicide based on a traffic accident in which the driver of another vehicle died. (Presentence Investigation Report ("PSR") ¶ 232.) He did not ultimately face criminal charges for that incident. (*Id.*) Two years later, at age 20, he was arrested again, this time for possession of marijuana. (*Id.* ¶ 227.) He was sentenced to seven years imprisonment, but the court suspended the term of imprisonment and placed him on probation for a term of five years. (*Id.*) A year and a half into his term of probation, at age 22, he was arrested again driving at a very high rate of speed while intoxicated. (*Id.* ¶ 228.) The charge was ultimately reduced from driving while intoxicated to public intoxication, and he escaped with a fine. (*Id.*) Two and a half years after that, at age 24, he was charged in a federal indictment for possession with intent to distribute approximately 800 pounds of marijuana. (United States District Court, Southern District of Texas, case no. 5:98-cr-500.)[1] He was never arrested

---

[1] Valdez was not extradited on the charges from the Southern District of Texas and, therefore, cannot currently face those charges pursuant to the Rule of

on those charges.  Instead, he moved to Mexico and began a sharp upward climb into the realm of cocaine trafficking.  By 2000, at age 27, he was already a significant player in the cocaine market, operating out of Nuevo Laredo, Mexico with customers in New Orleans and Memphis, and building his own drug trafficking organization ("DTO").  (*See id.* ¶¶ 21-22.)  By 2001, at age 28, he was sending shipments of 20-30 kilograms of cocaine every three to four weeks into the United States, which increased to 60-80 kilograms, and ultimately 150-180 kilograms per shipment.  (*Id.* ¶ 22.)

In September 2001, federal agents obtained a brief, but illustrative window into Valdez's operation.  (*Id.* 39.)  The month before, he agreed to meet a new distributor for one of his markets in the United States.  (*Id.*)  The distributor travelled to Nuevo Laredo to meet Valdez at one of Valdez's residences.  (*Id.*)  Valdez arrived in a caravan of three vehicles, including a Chevy Suburban and an extended cab pickup truck.  (*Id.*)  His vehicle was equipped with police lights and sirens.  Several armed men guarded the caravan of vehicles and the residence.  (*Id.*)  The group then moved to a second residence, which was large, had gun ports throughout, and was also surrounded by heavily armed men, some of whom appeared to be Mexican law enforcement officers.  (*Id.*)  During the meeting Valdez stated that he had 80 kilograms of cocaine sitting in the residence, and was expecting a shipment of 250 kilograms of cocaine and firearms the next day from his Colombian source of supply.  (*Id.*)  Valdez warned

_____

Specialty found in Article 17 of the Treaty between the United States of America and the United Mexican States of May 4, 1978.

the distributor not to cross him, threatening that he knew many people in high places and that he was paying the government a lot of money.  (*Id.*)  To ensure he would be able to carry through with any enforcement action if the distributor crossed him, Valdez required the distributor to tell him where the distributor lived before agreeing to enter into business.  (*Id.*)

That same year, Valdez staged a similar encounter with two potential customers from Memphis.  (*Id.* ¶ 76.)  When the customers crossed the border into Mexico, Valdez dispatched local police on his payroll to pick the customers up in police cars and deliver them to Valdez, who was surrounded by security guards carrying AK-47s.  (*Id.*)  Valdez staged this encounter purposely, to make an impression: he wanted people to fear him and know that he was in control and above the law.[2]  (*Id.*)  This image — that of the "enforcer" — was carefully crafted and became his key to notoriety both in and out of the cartel world.  (*See id.* ¶ 51.)

One of these Memphis customers, Craig Petties, ultimately became an important customer of Valdez and his gateway into the Memphis market, receiving shipments every three to four weeks of 50-60 kilograms of cocaine packed in crates and delivered to Memphis by tractor trailers.  (*Id.* ¶¶ 77-78, 83.)  The crates would be emptied, then re-packed with cash – approximately $1 million per trip – and transported back to Mexico.  (*Id.*)  Years later Petties fled to Mexico, where Valdez gave him refuge and allowed Petties to continue operating

---

[2] Indeed, the scene was "staged" for appearance over substance in that the AK-47s were actually not even loaded during this encounter.  (PSR ¶ 76.)

his Memphis operation from abroad.  (*Id.* ¶ 82, 103.)  Indeed, Valdez was protective of this important customer, and prevented other members of his drug trafficking organization from meeting him so they couldn't steal him as a customer.  (*Id.*)  However, Petties was ultimately arrested in Mexico and extradited back to the United States, where he was sentenced to life imprisonment on federal charges that included murder, kidnapping, drug distribution, and money laundering.  (*United States v. Petties*, No. 2:02-CR-20449, Doc. 1571 (W.D. Tenn. August 22, 2013).)

## B. Valdez Expands His Reach, but the Cartel War Forces Him Out Of Nuevo Laredo

By 2002, Valdez had built up a successful trafficking organization in Nuevo Laredo.  He had formed a partnership with co-defendant Carlos Montemayor ("Montemayor"), who had an infrastructure of trucks and drivers for transportation of cocaine obtained within Mexico to and across the United States border, with ultimate delivery to U.S. cities.  (PSR ¶¶ 24, 85, 93, 96-97.)  Together, Valdez and Montemayor developed a network to transport the organization's cocaine across the border from Mexico into Laredo, and to process and smuggle cash proceeds back into Mexico.  (*Id.* ¶¶ 24, 85.)  Valdez had also established control of one of the border crossing plazas leading into Laredo, enabling him to easily move shipments across the border, by partnering with the head of the plaza.  (*Id.* ¶ 86.)  Valdez continued to obtain his cocaine from various sources in Mexico, although he dispatched a lieutenant to Colombia in order to develop direct sources there.  (*Id.* ¶ 24.)  To the members of his organization, Valdez was

known as "La Barbie," in reference to his fair complexion and appearance.  (*Id.* ¶ 24.)

Valdez's Nuevo Laredo operation was also lucrative.  What cash Valdez was not investing in additional purchases of cocaine he used to fund construction of luxury residences, real estate, and other businesses.  (*Id.* ¶ 84, 99, 33.)  He also purchased two ranches in Nuevo Laredo, one of which consisted of 40-50 acres and had a mini zoo with rabbits, a lion, and other animals.  (*Id.* ¶ 84.)

However, Valdez's success in the area was not unnoticed.  In approximately 2002 the Gulf Cartel in Mexico dispatched its enforcement arm, the Zetas, to obtain control over the drug trade in the Laredo corridor.  (*Id.* ¶¶ 23, 86, 90.)  Violence in the area increased, with many people being killed or disappearing.  (*Id.* ¶ 86.)  The Zetas took over control of a border crossing plaza on the other side of Nuevo Laredo from the one controlled by Valdez, and eventually killed the man who operated Valdez's plaza.  (*See id.* ¶ 86.)  They burned multiple residences Valdez owned, and killed the animals in his zoo.  (*Id.* 99.)  In the face of rising safety concerns, Valdez and his subordinates evacuated Laredo and continued their operations in various locations in Mexico, most frequently in Monterrey, while he and his associates engaged in frequent violent incidents with the Gulf Cartel and Zetas for dominance of the Laredo corridor.  (*Id.* ¶¶ 23, 86, 90, 98, 104-106.)

## C.  Valdez Regroups and Aligns With Arturo Beltran-Leyva

When he moved the DTO to Monterrey, Valdez obtained four houses: one for his family, two for the DTO, and a fourth to be used as a "safe house" in case the

others were in jeopardy.  (*Id.* ¶ 92.)  Business in Monterrey, however, was not as lucrative and money was tighter.  (*See id.* ¶ 102.)  Valdez formed a relationship with a former state police officer in Monterrey, and gave him money to pay off the state and local police officers to prevent them from interfering with his DTO. (*Id.* ¶ 111.)  Valdez also used that connection to introduce him to Arturo Beltran-Leyva.  (*Id.* ¶¶ 111-112; *see also* Exhibit A (organizational chart).)  Beltran was a high-level cocaine trafficker based in Mexico City, and at that time he and his three brothers[3] were associated with Joaquin Guzman-Loera a/k/a "El Chapo," Ismael Zambada-Garcia a/k/a "Mayo," and the then-emerging Sinaloa Cartel. (PSR ¶ 25, 121.)  Over an initial meeting in Mexico City, Valdez and Beltran hit it off.  (*See id.* ¶ 113.)  Afterwards, a confident Valdez told an associate to get a nicer apartment in Mexico City because Valdez would be moving there.  (*Id.* ¶ 114.) Valdez had also learned that Beltran had a house with horse stables, but no horses, and formed a plan to ingratiate himself to Beltran.  (*See id.* ¶¶ 114-15.) Together with Carlos Montemayor, Valdez bought two horses and had them delivered to Beltran.  (*Id.* ¶ 115.)  They also sent a horse trainer, who stayed with Beltran for several days to teach Beltran about the horses.  (*Id.*)  The plan worked – Beltran loved the gift and Valdez was invited to do business with him directly. (*Id.*)

 After that, during the fall of 2002, Valdez moved the DTO operations from Monterrey to Mexico City.  (*Id.* ¶¶ 116, 119.)  He had numerous meetings with

---

[3] The four Beltran-Leyva brothers are Arturo, Alfredo, Carlos, and Hector.

Beltran in Mexico City, Acapulco, and at Beltran's ranch in Ixtapa De La Sol, and became known as a "Beltran Leyva guy."  (*Id.* ¶ 121.)  Valdez also met with Guzman on multiple occasions.  (*Id.* ¶ 121.)

**D. Valdez Gathers Allies and Goes to War to Reclaim Nuevo Laredo**

In early 2003, Valdez was sending shipments of 150-180 kilograms of cocaine to Memphis.  (*Id.* ¶ 120.)  Wanting to solidify a steady cocaine supply, he dispatched as associate to Colombia to meet with members of the Cali and Medellin cartels, as well as others in Bogota and Cartagena.  (*Id.* ¶¶ 122-128.)  Valdez's reputation had already spread throughout Colombia, where he was becoming well known for his war with the Zetas and widespread killings, earning him the nickname "El Tigre."  (*Id.* ¶¶ 125-27.)

At the same time, Valdez was working to stabilize his ability to send drugs across the border through the Laredo corridor.  (*Id.* ¶¶ 129-130.)  Valdez solidified his relationship with Beltran, meeting with him on an almost daily basis, and used Beltran's support to set up a meeting with Gulf Cartel kingpin Osiel Cardenas Guillen, whose people (including the Zetas) had taken over Nuevo Laredo and pushed Valdez out.  (*Id.* ¶¶ 129-31.)  Valdez brokered an agreement allowing him to continue to import cocaine through the Laredo corridor as long as he paid a tax to the Gulf Cartel to do so.  (*Id.* ¶¶ 130-31.)  The agreement, however, broke down shortly afterwards because Cardenas was arrested by authorities.  (*Id.* ¶ 131.)

Beltran advised Valdez to get out of Nuevo Laredo once again because of the instability.  (*Id.*) Nevertheless, Valdez vowed to push his rivals out of Nuevo

Laredo.  (*Id.*)  He used his relationship with Guzman to partner with one of Cardenas' former associates in the area.  (*See id.* ¶¶ 148-49.)  He also used his contacts to rally support against the Zetas, including from the leader of the Valencia/Milenio cartel, Armando Valencia-Cornelio, who hated the Zetas and was willing to provide money and manpower to fight them.  (*Id.* ¶ 150.) Eventually, Valdez convinced Beltran to support the fight too.  Beltran called a meeting attended by himself, Valdez, Valencia, and leaders of the Sinaloa cartel including Ismael Zambada-Garcia a/k/a "El Mayo," Ignacio Coronal Villarreal a/k/a "Nacho," Juan José Esparragoza Moreno a/k/a "El Azul."  (*Id.* ¶ 151.) Beltran said that Valdez was going to war with the Zetas and asked for their support.  (*Id.*)  Everyone gave it.  (*Id.*)

With the newfound backing, Valdez and his allies sent approximately 300 men to push the Zetas out of Nuevo Laredo and back into Reynosa.  (*Id.* ¶ 152.) Valdez provided many of his men with government uniforms and bribed members of law enforcement to allow his men to be commingled with their forces.  (*Id.* ¶ 153.)  Valdez himself wore a uniform at times.  (*Id.* ¶ 152.)  Violence increased, with members of the Zetas being robbed or disappearing.  (*Id.* ¶¶ 156- 57, 160)  Valdez made the final decisions in organizing the conflict with the Zetas.  (*Id.* ¶¶ 53, 157.)

During this time period, the Zetas used their contacts and influence with a local newspaper to make sure that Valdez was frequently on the cover of a local newspaper and blamed for the killings.  (*See id.* ¶ 126.)  Continually aware of the

power of image and the media, Valdez bought off the local newspaper and wrested control of it from the Zetas.  (*See id.* ¶ 155.)

In August 2003, the Zetas asked for a meeting to discuss a truce.  Valencia and others showed up, but were arrested by law enforcement.  (*Id.* ¶ 161.)  After that, a Mexican Federal Police Commander and his wife were killed, and violence increased even more.  (*Id.* ¶ 163.)  Many of Valdez's men were forced out of Nuevo Laredo, but some of Valdez's allies remained and continued fighting.  (*Id.* ¶ 164.)

### E.  Valdez Takes Control of Acapulco and Expands Into Atlanta

In late 2003 and early 2004, as Valdez and others continued to skirmish with the Zetas for control of the Laredo trafficking corridor, Valdez continued to expand his trafficking network and benefit from his close association with Beltran, taking over control of the port in Acapulco, Mexico.  (*Id.* ¶¶ 27, 138.) Valdez used the port to coordinate the importation of cocaine from Colombia and other South American countries using speedboats and airplanes, including shipments of as much as 3,000 kilograms at a time.  (*Id.* ¶ 141.)  He ran a network of drug houses in the area to process the shipments, and paid bribes to local law enforcement officials to protect his operation.  (*Id.* ¶ 138.)  He also cemented his relationship with Harold Mauricio Poveda-Ortega a/k/a "Conejo," who was Colombian and was able to arrange for Valdez to receive a steady supply of cocaine from Colombian DTOs.  (*Id.* ¶¶ 140-144.)

Valdez continued to cultivate his image, having his DTO members wear suits and ties, but taking off the jackets and ties when they went to night clubs in the

evening.  (*Id.* ¶ 135.)  Other associates of Beltran, however, disapproved of Valdez's "flashy" persona and the fact that he was always in the news.  (*Id.* ¶ 147.)

During this time Valdez continued his partnership with Carlos Montemayor, who coordinated the DTO's shipments of cocaine across the border into the United States from Nuevo Laredo.  (*Id.* ¶¶ 27, 143.)  Valdez's DTO was sending an average of 600-700 kilograms (sometimes up to 1,000 kilograms) of cocaine into the United States every three weeks – a rate that continued through 2007. (*Id.* ¶ 145.)  The drugs were shipped across the border into Laredo, Texas and then on to Memphis, Dallas, and San Diego.  (*Id.* ¶¶ 27, 143.)

Valdez and Montemayor also branched out and added Atlanta to their U.S. distribution network.  (*Id.* ¶ 135.)  Initially, shipments to Atlanta carried approximately 30 kilograms of cocaine, but they quickly escalated to shipments of 100 kilograms or more. (*Id.* ¶ 28.)  As 2004 went on, Valdez and Montemayor sought out a more formalized distribution organization for their cocaine customers in Memphis and Atlanta.  (*Id.*)  Jesus Hector Flores,[4] who is Montemayor's cousin and who had drug contacts in Memphis, agreed to coordinate the receipt and distribution of loads of cocaine delivered via tractor trailer truck.  (*Id.*)  In the spring of 2005, because the Atlanta business had increased so significantly, at Montemayor's request, Flores opened a second U.S. base of operations for the organization in Atlanta.  (*Id.*)

---

[4] Flores was eventually sentenced to 460 months imprisonment in N.D. Ga. case no. 1:05-CR-558.  (PSR at Related Cases.)

In both Memphis and Atlanta, Flores recruited workers to establish stash houses, and these individuals worked full time in the operations of the cocaine distribution organization. (*Id.* ¶ 29.) The workers met the tractor trailer trucks and offloaded shipments of between 100 to as much as 300 kilograms of cocaine, usually every week but sometimes twice a week. (*Id.*) The workers parceled the cocaine and conveyed it to customers, and accepted bulk cash payments which they processed and delivered to tractor trailer trucks heading back to the Mexican border. (*Id.*) Eventually, the currency was smuggled across the border and remitted to the organization's supervisors in Mexico. (*Id.*) In Atlanta alone, the organization distributed a total of 1,500 kilograms of cocaine in just six months. (*Id.*)

### F.  The DEA Uncovers and Takes Down the Atlanta Distribution Cell

The DTO's activities in Atlanta were eventually discovered by agents with the Drug Enforcement Administration ("DEA"). (*Id.* ¶ 34.) On June 10, 2005, DEA agents began intercepting the first in a series of court-authorized wiretaps of one of the DTO's customers in Atlanta. (*Id.*) Evidence from that wiretap then led to wiretaps of Flores and his workers in Atlanta. (*Id.*) The intercepted calls revealed a particularly disciplined and regimented organization – the conspirators used military-like precision and orders, where nothing could be done without approval and consultation or instructions from the supervisors in Mexico. (*Id.*) Agents ultimately determined that Valdez and Montemayor were partners, supervisors, and the sources of supply for the Atlanta organization. (*Id.* ¶ 35.) Ruben Hernandez a/k/a "Super" or "Secre," was Valdez's bookkeeper

and logistics coordinator.[5]  (*Id*.)  Roberto Lopez a/k/a "Shrek," was
Montemayor's primary lieutenant and oversaw transportation.  (*Id*.)  Carlos
Montemayor's brother, Juan Montemayor a/k/a "Vice," contributed his own
U.S.-based customers and provided other support.[6]  (*Id*.)  Valdez and Carlos
Montemayor each had their own customers for which they received personal
proceeds, but they pooled their cocaine supply and used the same transportation
and distribution network.  (*Id*.)

Ultimately, on August 17-18, 2005, based on information from the wiretaps,
agents coordinated a traffic stop of a tractor trailer truck driving from Atlanta to
Texas.  (*Id*. ¶ 36(c).)  Inside, they found proceeds from the DTO's cocaine sales
that had been collected and packed by the Atlanta workers, destined for Mexico.
(*Id*.)  That shipment — a single example of the type of transport that occurred
approximately weekly — contained $2.5 million in cash.  (*Id*. ¶¶ 36(c), 29.)  On
November 15, 2005, agents raided a stash house in Atlanta.  (*Id*. ¶ 36(e).)  Inside
they discovered, on that single day, 120 kilograms of cocaine and $1.5 million in
cash.  (*Id*.)  Agents arrested four workers at the stash house and then arrested
Flores in Laredo the following morning.  (*Id*.)

---

[5] Hernandez was sentenced to 268 months imprisonment in this case.  (PSR at
Codefendants.)

[6] Juan Montemayor was sentenced to 262 months imprisonment in this case.
(PSR at Codefendants.)

### G. Valdez Continues His Kingpin Life

At age 32, after losing 120 kilograms of cocaine, $4 million in cash, and several of his workers in Atlanta, Valdez was undeterred.  He continued his operations in Mexico.  (*Id.* ¶ 37.)  He continued to ship an average of 600 kilograms of cocaine into the United States every two to three weeks.  (*Id.* ¶¶ 145, 186.)  He also continued to cultivate his cartel image.  He wanted to be flashy, and started purchasing high-end clothes and suits.  (*Id.* ¶ 172.)  He continued to purchase property, where he built new houses and horse stables.  (*Id.* ¶ 173.)

Valdez also spent a lot of money on security.  He rented multiple houses under other people's names, and sometimes would not even let close associates know where he was staying due to security issues.  (*Id.* ¶ 174.)  He had several state and local law enforcement officials on payroll to act as bodyguards and to intervene if he were ever stopped by local authorities.  (*Id.* ¶ 176.)  He had a security detail of 20-30 men who carried automatic weapons, many of whom had prior law enforcement experience.  (*Id.* ¶¶ 177-78.)   His DTO received shipments of weapons, including AK-47s, AR-15s, pistols, M-16s with grenade launchers, night vision equipment, 50-caliber rifles designed to be mounted on vehicles, body armor, and rocket-propelled grenades.  (*Id.* ¶¶ 32, 65, 68.)  He had a gun smith who converted rifles from semiautomatic to fully automatic.  (*Id.* ¶¶ 64, 181.)

Valdez also cultivated his reputation as a ruthless enforcer.  When his security team captured a member of the Zetas who had been sent to Acapulco to assassinate Valdez, the security team made a video tape of Valdez and others

questioning him.  (*Id.* ¶¶ 62-64, 183-85.)  The man was then executed with a shot to the head.  (*Id.*)  Valdez and Montemayor had their associates make multiple copies of the recording and send them to media outlets in the United States and Mexico, and even wanted it sent to United States law enforcement.  (*Id.* ¶¶ 62-64, 185.)[7]  The video quickly went viral on the internet.

### H. Valdez's Allies Split and Fall, and He Is Arrested

On January 21, 2008, Alfredo Beltran-Leyva was arrested in Mexico.  (*United States v. Beltran-Leyva*, No. 1:12-CR-184, Doc. 174 at 2 (D.D.C. May 31, 2016).)[8] Arturo Beltran-Leyva and his brothers blamed Guzman and the Sinaloa Cartel for Alfredo's arrest, and split from them.  (PSR ¶ 37.)  The Beltran-Leyva brothers established their own operations, known as the Beltran-Leyva Cartel, with Arturo Beltran-Leyva at the head.  (*Id.*)

After the split, Valdez continued his close association with Arturo Beltran-Leyva, as well as his partnership with Carlos Montemayor.  (*Id.*)  Valdez's organization continued to receive shipments of cocaine from Colombia, delivered by submarine, airplanes, or speedboats, and arranged for the delivery of the cocaine to customers in the United States.  (*Id.*)

---

[7] *See From High School Star to Mexican Drug Cartel*, ABC NEWS, May 19, 2010, available at https://www.youtube.com/watch?v=v_I5sLvBYds (last visited June 4, 2018) (showing clip from the described video).

[8] Alfredo Beltran-Leyva was subsequently sentenced to a term of life imprisonment after pleading guilty to one count of conspiracy to distribute cocaine and methamphetamine.  (*United States v. Beltran-Leyva*, No. 1:12-CR-184, Doc. 249 at 2 (D.D.C. April 13, 2017).)

On December 16, 2009, Arturo Beltran-Leyva was killed during a firefight with a unit of the Mexican Navy.  (*Id.* ¶ 38.)  On December 30, 2009, Carlos Beltran-Leyva was arrested in Mexico.[9]  After Arturo Beltran-Leyva's death and Carlos Beltran-Leyva's arrest, Hector Beltran-Leyva became the leader of the Beltran-Leyva cartel.[10]  Hector Beltran-Leyva, however, did not trust Valdez and the two began to feud.

Mexican authorities continued searching for Valdez and located him on several occasions, but he was able to elude capture by making a series of close escapes.  (*Id.*)  Finally, at age 37, Valdez was arrested by Mexican Federal Police on August 30, 2010, at a ranch he owned near Mexico City.  (*Id.*)  He was extradited to the United States on September 30, 2015.  He expeditiously entered a non-negotiated guilty plea to all counts on January 6, 2016.  Today, at age 44, Valdez faces sentencing for his two decades of drug trafficking crimes.

---

[9] *See* William Booth, *Mexican agents arrest brother of Beltran Leyva, drug lord killed in raid*, WASH. POST, Jan. 4, 2010, available at http://www.washingtonpost.com/wp-dyn/content/article/2010/01/03/AR2010010300390.html?noredirect=on (last visited June 4, 2018).

[10] Hector Beltran-Leyva was arrested in Mexico on October 1, 2014, and proceedings to extradite him to the United States to face federal charges are ongoing.  Tracy Wilkinson, *Drug cartel leader Hector Beltran Leyva arrested in Mexico*, L.A. TIMES, Oct. 1, 2014, available at http://www.latimes.com/world/mexico-americas/la-fg-mexico-drug-cartel-beltran-leyva-20141001-story.html (last visited June 4, 2018); *Mexican court blocks drug lord's extradition to U.S.*, REUTERS, April 12, 2017, available at https://www.reuters.com/article/us-mexico-drugs-idUSKBN17E2GK (last visited June 4, 2018).

**2.  Sentencing Guidelines**

Under the United States Sentencing Guidelines, Valdez's advisory sentencing range is calculated as a base offense level 38 because it involved at least 12,000 kilograms of cocaine.  (*Id.* ¶ 203.)  He receives upward adjustments for:

- · possession of weapons,

- · the use of violence,

- · bribery of a law enforcement official,

- · maintaining premises for the purpose of distributing a controlled substance,

- · importing a controlled substance as a part of a pattern of criminal conduct engaged in as a livelihood,

- · being the leader of a criminal activity that involved five or more participants, and

- · the use of body armor during a drug trafficking crime.

(*Id.* ¶¶ 204-211.)  After a decrease of three levels for acceptance of responsibility, his total offense level is 51.  (*Id.* ¶ 224.)

Valdez did not object to any of the Guidelines calculations.  The government submitted one objection, noting that Valdez should receive two additional criminal history points pursuant to U.S.S.G. § 4A1.1(d) because he committed the instant offense, specifically, conspiring with others to distribute controlled substances, while he was on probation.  While this change of criminal history category would not affect the ultimate sentence range under the Guidelines, in order for the Court to accurately calculate the Guidelines, the government notes that, based on the uncontested facts in the PSR, as early as 2000, Valdez was

17

already a significant player in the cocaine market, operating out of Nuevo Laredo, Mexico with customers in New Orleans and Memphis.  (*See id.* ¶¶ 21-22, 227.)  At the same time, in 2000 and continuing to March 10, 2001, Valdez was on probation for marijuana possession charges.  (*Id.* ¶ 227.)  Correspondingly, his criminal history category should be II instead of I.  (*Id.* ¶ 229.)

**3.  A Reasonable Sentence**

A district court should begin all sentencing proceedings by correctly calculating the advisory Guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  While the Guidelines are significant factors in the Court's sentencing decision, the Court must ultimately determine a reasonable sentence based on the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Pugh*, 515 F.3d 1179, 1188 (11th Cir. 2008).  As to the section 3553(a) factors, the Court is to consider, inter alia, (1) the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) the need for deterrence; and (3) the need to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a).  The law also provides for the forfeiture of the proceeds a defendant obtained from trafficking in controlled substances.  *See* 21 U.S.C. § 853(a)(1).  Pursuant to these factors, and for the reasons set forth in the government's separately filed pleading, the government requests that Valdez be sentenced to a term of

imprisonment of 660 months.[11]  The government also requests that the Court order Valdez forfeit a sum of $192,000,000.[12]

### A. The Nature and Circumstances of the Offense, the History and Characteristics of the Defendant, and the Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

Valdez grew up with a comfortable life in Texas and, instead of becoming a productive citizen, chose to aggressively pursue the lifestyle of a brutal leader of a drug trafficking organization.  He committed serious crimes against the United States, over an extended period of time, by his creation and leadership of an expansive Mexican DTO that was responsible for transporting multi-ton quantities of cocaine from Colombia to Mexico for ultimate importation into the United States.  His actions not only brought massive quantities of poison into communities across the United States, but they spread violence, public corruption, and misery throughout Mexico.

Valdez's life was not a byproduct of abject poverty or coercion; he left his family and life in the United States behind and squandered multiple chances to turn his life around after encounters with the law in his youth that resulted in dropped or reduced charges.  Instead, he chose to become a DTO enforcer, enthusiastically wrapping himself in a mantle of violence, lawlessness, and

---

[11] That is, a term of 660 months on all counts except for Count Nine, for which the statutory maximum is 240 months.

[12] The government is filing a separate motion for preliminary order of forfeiture in support of this request.

intimidation.  He started his own DTO and built it from the ground up, partnering strategically along the way to grow the organization and ally with larger cartels.  He ended up forming a DTO that this Court, in the course of sentencing lower-ranking members of the organization, described as "the most efficient, ruthless drug organization I have ever seen."  (*United States v. Flores*, No. 1:05-CR-558-WSD, Doc. 397 at 20 (N.D. GA August 19, 2008).)

He purposely made a show of weapons, threats, and corrupt law enforcement support (and even video-taped executions) to win obedience from customers and associates, and also to dissuade rivals from challenging him.  Moreover, this show was not just an act; when challenged, he carried through with his promises and was responsible for instigating and leading a deadly turf war between the Sinaloa Cartel and Gulf-Zeta alliance that rained untold violence and misery on the people of Mexico.  An unknown number of people were killed in this violence or "disappeared," with their family never fully knowing what happened.  Further, he coerced or tempted public servants in the Mexican government and law enforcement away from serving the good of society with threats and bribes, causing them to either look the other way while he victimized their neighbors, or even join his forces in open combat.  In doing so, he destroyed trust in government and the structure of communities.

Valdez was also not just a regular drug trafficker.  He was the founder and head of a DTO that was directly responsible for bringing tons of cocaine into the United States, and was a high ranking member within the Sinaloa Cartel and later the Beltran-Leyva Cartel, both of which dealt in even larger quantities of

drugs.  As the Court is well aware, cocaine is an extremely dangerous and destructive illegal street drug.  Cocaine abuse has devastated communities in the United States, Colombia, Mexico and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on innocent family members and children.  It is also a very destabilizing and corruptive force in countries throughout the region whose law enforcement institutions are too overwhelmed to combat it, such as in Mexico, further adding to the destructive nature of the crime.  Its social costs have been enormous.  And for years Valdez was responsible for a significant portion of that poison.

**B. The Need for Deterrence**

Given the adverse impact that drug trafficking has on society, especially at the high levels in which Valdez operated, it is important that the Court impose a sentence that deters others from undermining the rule of law.  Further, while this prosecution has incapacitated some of the narcotics trafficking through Mexico, importation of controlled substances from Mexico and the region into the United States still occurs.  The recommended sentence would provide a critical general deterrence to other narcotics trafficking leaders that their participation in narcotics importation into the United States will result in substantial sentences.

However, even more than in typical high-level drug trafficking cases, this case warrants a special consideration for deterrence.  Valdez was not a low key trafficker trying to stay out of the attention of law enforcement; instead he purposely lived a flashy lifestyle and crafted his image in the media to impress and terrorize others.  He became a role model of sorts for young people looking

21

to make money fast and earn power, and he showed them that they could do so by rising high into the ranks of a drug cartel even if they grew up playing football in an All-American town. *See From High School Star to Mexican Drug Cartel*, ABC NEWS, May 19, 2010, available at https://www.youtube.com/watch?v=v_I5sLvBYds (last visited June 4, 2018) (also showing part of the execution video described above). He dressed in nice suits, went to clubs, and was frequently featured on front pages of newspapers. He even used his money and power to buy a local newspaper to control its coverage of him and his war with the Zetas, and purposely sent an execution video to media outlets, triggering a viral video phenomenon. Valdez's sentence should clearly signal that the lifestyle he led was not glamorous, and any time of wealth and power he enjoyed will be significantly overshadowed by the time he will serve in prison without the benefit of his ill-gotten gains.

## C. The Need to Protect the Public from Further Crimes of the Defendant

Valdez faced his first federal drug trafficking charges in 1998. He became a fugitive, and his crimes expanded exponentially. He flooded Mexico and the United States with tons of cocaine, without regard for harm to others. He affirmatively went to war with rival cartels, and showed no mercy. He used his ruthlessness to accumulate massive amounts of wealth, which he used to corrupt government and law enforcement officials and to further insulate himself from the consequences of justice or morality. A truly lengthy sentence is the only way to protect the public from further crimes committed by the Defendant. When he leaves the controlled environment of prison, he must be rendered incapable of

22

inflicting further harm on society no matter what remaining financial resources he may have hidden or allies who may still be loyal to him.

## 4.  Calculation of a Specific Sentence

Valdez's conduct and his history without doubt warrants a sentence of life in prison.  However, the government is not requesting life; it is instead requesting a term of imprisonment — 660 months — that is just shy of a life sentence with a chance that Valdez will walk out of incarceration one day when he is no longer able to harm others.  This request is warranted by Valdez's conduct since the time of his extradition.  Specifically, he pled guilty to all the charges against him and, most importantly, did so as expeditiously as possible given the complex and voluminous discovery in the case dating back as much as a decade prior, combined with logistical issues such as language barriers and security restrictions.

His early plea, which occurred before the government took significant steps to start preparing for suppression litigation and trial, saved a tremendous amount of court and government resources.  It sent a clear message to the public and other criminals that "La Barbie" had finally been brought to justice and would have to face the consequences of his crimes, and even high level traffickers are not outside of the reach of the law.  The early plea also allowed the government to avoid taking steps such as transferring incarcerated witnesses to the district, an action which often signals that a the incarcerated person is cooperating and exposes them and their families to significant danger of violence, and also prevented the attendant security risks that such movement could engender.  For

those reasons, as well as the reasons set forth in the government's separate sealed filing, a sentence of less than life imprisonment is warranted.  Additionally, a sentence of less than life is appropriate to incentivize similar early pleas from defendants who want to accept responsibility for their conduct; a sentence of life imprisonment would affirmatively discourage other high-level drug traffickers from pleading guilty.

The government's recommendation assumes that Valdez will receive credit for all the time he has been incarcerated since he was arrested on August 30, 2010, including time prior to his extradition to the United States.  *See* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed; or . . . as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed . . . .").  Generally, calculation of the appropriate amount of time served prior to extradition, and credit for that time against the sentence imposed, is a task delegated to the Bureau of Prisons.  *See United States v. Alexander*, 609 F.3d 1250, 1259 (11th Cir. 2010).[13]  However, if a sentencing court does perform the calculation, it will not be reversed on appeal unless the defendant can show he was prejudiced because the credit applied by the court was less than what BOP

---

[13] And, if a defendant disagrees with BOP's determination, the defendant must exhaust all administrative remedies before seeking relief from a court.  *Id.*

would have calculated.  *See Hernandez v. United States*, 542 F. App'x 865, 866-67 (11th Cir. 2013).

## 5.  Forfeiture of Drug Proceeds

As stated in the government's Memorandum of Law in Support of Motion for Preliminary Order of Forfeiture, pursuant to the forfeiture provision in the indictment, the government is requesting a forfeiture judgment equal to the amount of proceeds Valdez obtained as a result of his drug trafficking offenses. (Doc. 292-1.)  Because Valdez's assets are likely in Mexico, in lieu of forfeiting specific assets, the government is requesting a money judgment.

Based on uncontested facts in the PSR, Valdez was responsible for the distribution of at least 12,000 kilograms of cocaine (a conservative estimate). (PSR ¶ 203.)  From 2005 until 2007, the average sales price for a kilogram of cocaine in Atlanta, North Carolina, South Carolina, and Chicago was $16,500, and $15,500 - $17,000 in Memphis.  (*Id.* ¶ 186.)  Giving Valdez the benefit of any doubts, based on an estimated average sales price of $16,000 per kilograms of cocaine (a conservative estimate), Valdez would have collected at least $192,000,000 of proceeds from his cocaine distribution.  Valdez should not be allowed to keep the proceeds from his illegal activities that inflicted so much damage on so many people.  Through the forfeiture order, the government is seeking to disgorge some measure of the riches Valdez amassed during his kingpin years and deprive him of the benefit from those funds.  As a conservative estimate, the government respectfully requests that the full $192,000,000 judgment be assessed against Valdez.

**Conclusion**

For the reasons stated above, the government respectfully requests that the Court sentence Edgar Valdez-Villareal to a term of imprisonment of 660 months, and order he forfeit $192,000,000.

Respectfully submitted,

BYUNG J. PAK
*United States Attorney*

/s/ELIZABETH M. HATHAWAY
*Assistant United States Attorney*
Georgia Bar No. 076212
Elizabeth.Hathaway@usdoj.gov

/s/GARRETT L. BRADFORD
*Assistant United States Attorney*
Georgia Bar No. 074374
Garrett.Bradford@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

June 4, 2018

/s/ GARRETT L. BRADFORD

GARRETT L. BRADFORD

*Assistant United States Attorney*