```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3   UNITED STATES OF AMERICA        )
                                    )
4                  Plaintiff,       )    CRIMINAL ACTION FILE
    v.                              )    NO. 1:09-CR-551-WSD-1
5                                   )
    EDGAR VALDEZ-VILLAREAL (1)      )    ATLANTA, GEORGIA
6                                   )
                   Defendant.       )
7   _____)       S E A L E D
                                         Pages 3 through 24
8   UNITED STATES OF AMERICA        )
                                    )
9                  Plaintiff,       )    CRIMINAL ACTION FILE
    v.                              )    NO. 1:16-CR-155-WSD
10                                  )
    EDGAR VALDEZ                    )    ATLANTA, GEORGIA
11                                  )
                   Defendant.       )
12  _____)

13              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
14              UNITED STATES DISTRICT JUDGE

15                      SENTENCING
                 Monday, June 11, 2018
16

17  APPEARANCES OF COUNSEL:

18  For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
                              (By:  Elizabeth M. Hathaway
19                                  Garrett L. Bradford
                                    Michael John Brown)
20
    For the Defendant:        MALOY JENKINS PARKER
21                            (By:  Wilmer Parker, III
                                    W. Bruce Maloy)
22
                              Adriana Arce-Flores
23

24       Proceedings recorded by mechanical stenography
           and computer-aided transcript produced by
25              NICHOLAS A. MARRONE, RMR, CRR
                      (404) 215-1486
```

I N D E X

| Speaker | Page |
|---|---|
| Karla Valdez | 59 |
| Abel Valdez | 71 |
| Allocution by the Defendant | 90 |
| Sentence by the Court | 107 |

(Transcript Pages 3 through 24 filed under seal.)

United States District Court
Northern District of Georgia

```
1                        -- -- --
2            (BEGINNING OF SEALED PORTION)
3                        -- -- --
4                  Monday Morning Session
5                      June 11, 2018
6                       9:09 a.m.
7                        -- -- --
8              P R O C E E D I N G S
9                        -- -- --
10                    (In chambers:)
11           THE COURT:  Good morning, everybody.
12           This is an in-chambers conference in United States
13   v. Edgar Valdez-Villareal, two cases, 09-551 and 16-155.
14           Ms. Hathaway and Mr. Bradford are here for the
15   government.  Mr. Parker, Mr. Maloy and -- Ms. Arce-Flores?
16           MS. ARCE-FLORES:  Yes, Judge.
17           THE COURT:  -- are here for the defendant.
18           And the question I guess has come up, because
19   we had agreed previously that we would hold a sealed
20   discussion on the government's motion for downward departure,
21   but I understand now that there is some question about who
22   can be in the sealed hearing, and specifically can ████████
23   ███████████████████ be there since he's not of record and
24   otherwise would not be permitted unless the parties
25   consented.
```

4

1         But I understand that now that he is going to

2    testify as a witness in the hearing on the motion for

3    downward departure to which the government objects.

4         Is that a fair summary?

5         MR. PARKER:  Objects to it being sealed because of

6    the testimony, that's my understanding.

7         MS. HATHAWAY:  That's right.

8         THE COURT:  And why is that?

9         MS. HATHAWAY:  Your Honor, it seems different to me

10   having an in-chambers discussion about under-sealed filings

11   with the Court to make it sealed.  Once there is testimony

12   being taken, it becomes more of a hearing that I think the

13   public then has a right to attend.

14        THE COURT:  And what's your authority for that?

15        MS. HATHAWAY:  Well, I think it's up to the defense

16   to make the showing that the hearing should be sealed.  The

17   default is that hearings are open to the public.

18        THE COURT:  But what would be the difference if we

19   had a hearing -- well, I understand that, and I'm a big

20   proponent of open hearings.

21        But everybody agrees that this is a sensitive

22   matter, his cooperation is sensitive and could subject him to

23   physical harm and threats to his personal security, and for

24   all those reasons I thought it made sense to have this as a

25   sealed hearing.

1          If somebody had come in and explained and stated in

2    a conference at which he didn't testify what he would say or

3    what additional information might be helpful in me ruling on

4    the motion, I suspect you wouldn't have any objection to

5    that.

6          But what would be the difference if it was

7    communicated to me indirectly as opposed to having him

8    testify?  It seems to me the same concerns are present.

9          And maybe in a second we will get a summary of

10   what -- and his name is what?

11        MR. PARKER:  ████████████████████████████

12        THE COURT:  I will get a proffer of what he's going

13   to say to see if that implicates the same concerns.  Maybe we

14   should start with that.

15        MR. PARKER:  Your Honor, the concerns are really

16   as much, if not more so, about the identification in a

17   public way of ███████████████████ participation as an

18   intermediary in '08, '09 and 2010 in facilitating the

19   communications between his brother, who was then in the

20   Beltran-Leyva cartel, passing information to ████████████

21   ██████ who then caused it to go to DEA or FBI or other

22   U.S. law enforcement officials as they did their

23   activities.

24        THE COURT:  But, you know, I have seen all

25   that.  I'm pretty aware of all that.

1    MR. PARKER:  I know, but that was filed sealed.

2    That was filed under seal.

3    THE COURT:  Right.  So I guess why does he have to

4    testify about something that I am already aware of?

5    MR. PARKER:  Well, I was simply trying to identify

6    preliminarily how it came about that he got involved at that

7    point.  That's all -- I'm looking at no more than about

8    thirty minutes of testimony is my point.

9    THE COURT:  I mean, why is -- see, to me it

10   seems most important that those communications occurred,

11   and I understand what the government's response was to all

12   of that.  It doesn't matter really who did that.

13   I take it that they were done legitimately,

14   that the communication as to what he might be willing to

15   accept and whether he would surrender or not, I don't

16   think that that's an unusual sort of thing in a case like

17   this.

18   I'm just not sure what he adds.

19   MR. PARKER:  Well --

20   THE COURT:  And why would we want to run the risk

21   of identifying him, because all somebody has to do -- if we

22   are going to do that, I would have to have to tape closed the

23   windows in the back.

24   MR. PARKER:  I understand the point you are making,

25   Your Honor.

1          What I need to try to do ████████████████████ is to

2     address the obvious legal issue that the Court and the

3     government presents, I understand, and to see if we can't try

4     to facilitate an open hearing, and have it all open and have

5     him testify, you know, on some matters and move on from there

6     whenever the Court might want to.

7          I mean, I am prepared to make various arguments

8     publicly, because it's publicly identified, whether it's

9     acknowledged by the government, that Edgar Valdez-Villareal,

10    as the Court knows from some of the submissions, was the

11    person who identified the location of Arturo Beltran-Leyva,

12    which resulted in his death.

13         It's been publicly identified since it was

14    in Washington in the courtroom up there that

15    Edgar Valdez-Villareal was going to be a witness against

16    Alfredo Beltran-Leyva.  That's no secret.  And those are

17    obviously points I'm going to be making in argument to the

18    Court and which would address the 5K issue.

19         I'm not suggesting that we make argument sealed on

20    the 5K issue.  I was simply trying to think about the fine

21    point of the identification of █████████████ as it's his

22    participation in events that, quite frankly, the members of

23    the cartel who are still out and about might view as

24    justifiable for violent purposes as well.

25         THE COURT:  I'm a little confused.  So we have two

1    hearings this morning.  One is this sealed hearing on the
2    downward departure issue, then we have the sentencing?
3              MR. PARKER:  Well, I was going to suggest that we
4    not have a sealed hearing on the downward departure.  We just
5    make everything open.
6              THE COURT:  We can do that.  That would make
7    sense.  And then he can testify in the sentencing if you
8    wanted him to or not.
9              MR. PARKER:  Right.
10             THE COURT:  All right.  Does that make sense to
11   everybody?
12             MS. HATHAWAY:  Yes, sir.
13             THE COURT:  So what I believe is going to happen,
14   to make sure it is what you believe is going to happen, is
15   that at some point after you talk to ███████████ you will
16   say we are ready, and we will have a single public hearing on
17   the sentencing?
18             MR. PARKER:  Correct.
19             THE COURT:  Okay.  And we will take the departure
20   motion after I make guideline findings.
21             MR. PARKER:  Right.
22             THE COURT:  Okay.
23             MS. HATHAWAY:  And just so I'm clear as well, we
24   are fine in open court then discussing pretty much everything
25   that is in the government's motion?

1        MR. PARKER:  Except I would suggest -- I would

2   request -- I mean, you've made it very clear as to the

3   quality of his debriefing since his incarceration here.

4        MS. HATHAWAY:  Uh-huh.

5        MR. PARKER:  I wasn't going to bring out in public

6   what you know in private from the sealed motion about his

7   debriefings, you know, and possibly being a witness against

8   El Chapo, you know, Guzman --

9        MS. HATHAWAY:  Sure.

10       MR. PARKER:  -- and, you know, other investigations

11  that are ongoing that you identified and I will state,

12  you know.

13       So I mean, I wasn't -- the two things I'm obviously

14  addressing are the two Beltran-Leyva brothers --

15       MS. HATHAWAY:  Okay.

16       MR. PARKER:  -- as well as some other things that

17  are not in my view security -- sensitive to the security of

18  either the defendant or his family.

19       THE COURT:  But the things that -- just so we are

20  clear, what are the things that you believe should not be

21  discussed, which I know about already because I read

22  everything, in open court that could raise security

23  concerns?

24       I guess one is Guzman.

25       MR. PARKER:  Well, the actual things are this.

1    So this family, that's very --

2              THE COURT:  You should take some notes on this.

3              MS. HATHAWAY:  Yes.

4              MR. PARKER:  -- open and above living in Laredo,

5    Texas, is obviously having to live with the fear of harm

6    being brought to them as a result of, you know, their son's,

7    their brother's, you know, conduct.

8              And to the extent that more is identified about ▮▮▮▮▮

9    ▮▮▮▮▮ involvement in helping Edgar Valdez-Villareal

10   *vis-a-vis* trying to make a deal with the U.S. government

11   through whatever activities he did, whether in Mexico or

12   since, it exposes the family more to the threat.  Okay?

13             THE COURT:  Well, that makes sense to me.

14             MR. PARKER:  So it's the family's concern.

15             I mean, I expect the federal government, I expect

16   the Bureau of Prisons to put this gentleman into a location

17   where he is protected.  Okay?

18             THE COURT:  Right.

19             MR. PARKER:  That's one security issue, but that's

20   one that the government is going to be responsible for.

21             The other security issue deals with the family.

22   And as part of the 5K motion, in the 5K notes, the Court can

23   take into consideration threats not only to the defendant,

24   but threats to the family as well, as a basis for a 5K

25   departure.

1        Now, I wasn't going to go into details in front of

2  the family about why they should be in fear, because I don't

3  think we need to do that.  And there are some members of the

4  family who, quite frankly, are children, and I don't think

5  they need to hear why they are in jeopardy of their

6  security.

7        And now that we are talking on the record in front

8  of the Court, you understand exactly that point, and you can

9  evaluate it and weigh it and assess it.

10        THE COURT:  And I have done that before.

11  I understand.

12        MR. MALOY:  And, Your Honor, just to be clear, I

13  don't believe that there is any activity by the family ██████

14  ██████████████████████ acting as an intermediary.

15        THE COURT:  That's what I was going to ask.  So

16  there is no need to mention ████████████ specifically --

17        MS. HATHAWAY:  No.

18        THE COURT:  -- or any threats that could be

19  suffered by the family, because I'm aware of that already.

20        MS. HATHAWAY:  Okay.  And I would just talk about

21  then his willingness to testify in Alfredo Beltran-Leyva's

22  trial, and also generally that he's fully debriefed.

23        MR. PARKER:  That's fine.

24        THE COURT:  There is some potential for testimony

25  in yet unmature cases where he might, in fact, cooperate in a

1  way that can give a Rule 35 motion.

2          MR. PARKER:  Right.

3          THE COURT:  Okay.  So just to be clear, so the

4  two things we are not going to talk about that I'm already

5  aware of are, one, the family could be at risk, and so we

6  won't mention that, about the family's risk, because I know

7  that.

8          And, second, ███████████████████████████████

9  I know that, so we won't mention the fact that he played that

10 role.

11         And then, second, that with respect to cooperation

12 which he has and may in the future provide in other cases,

13 the government is not moving for a 5K on the basis of that

14 cooperation anyway, but reserves the right should they

15 believe that that's been helpful to file a Rule 35 motion

16 when that cooperation can be further evaluated, especially

17 the impact that it might have on other investigations and

18 cases.

19         So there is no need to mention that, and

20 specifically the Guzman case.

21         MR. MALOY:  Your Honor, I don't know if it's

22 time --

23         MS. HATHAWAY:  And -- I'm sorry, it's Guzman and

24 Beltran-Leyva.

25         THE COURT:  I'm sorry.

1          MR. MALOY:  I've never been in this situation

2    before, so I'm not sure that this is the appropriate time to

3    bring this up, but on a Rule 35, the judge considering the

4    Rule 35 is not going to be you.  That's apparent.

5          THE COURT:  Right.

6          MR. MALOY:  That's clear.  Is it appropriate to ask

7    you to make a statement that your sentence is not taking into

8    account his future cooperation?

9          Because I worry that a new judge coming to the case

10   would be unsure about whether or not you had given a sentence

11   that sort of gave him the benefit of the doubt and said,

12   well, I understand he's going to be cooperating in the

13   future, so I'm taking that into account too.

14         THE COURT:  That's a good point.  I think what

15   I can say is that I am determining this 5K 1.1 motion

16   solely on his cooperation to date that was set forth in

17   the government's motion for downward departure, and that

18   I am not considering any cooperation that he might have

19   given or might in the future give with respect to ongoing

20   or future investigations or providing assistance testimony

21   or other assistance in actual investigations and

22   prosecutions.  And so I'm just limiting it to what has

23   happened to date.

24         So you will have a record of that.

25         MR. MALOY:  Thank you, Your Honor.

1          MR. PARKER:  There are two clarifications, just so

2     we don't make -- so I don't make a mistake.

3          THE COURT:  Well, I'm in favor of you not making a

4     mistake.

5          MR. PARKER:  You know, I don't really intend to

6     make mistakes, but sometimes they happen.

7          THE COURT:  They do.  I have had that experience

8     myself.

9          MR. PARKER:  It's a condition of humanity.

10          So one of the things that happened back in '09 was

11     the disclosure by the defendant -- it's identified in the

12     communications that you saw, Your Honor    of DEA agents in

13     country -- in the country, and it was -- I expect that

15     getting information from a Mexican intelligence official and

16     that -- or that Edgar Valdez became aware of that because a

17     Mexican intelligence official -- or Mexican officials I

18     should say, corrupt officials, released that information to

19     the cartels:  Photographs, names.  Real names, not their

20     undercover names.

21          And that was something that was transmitted

22          who then transmitted it to the government.  It wasn't

23     something used as a negotiating tool.  It was done for all

24     the right reasons, I would argue and will argue, to save

25     lives and to disclose.

1     That's one thing.

2     THE COURT:  Okay.

3     MR. PARKER:  And I can do it just like I just did,

4 if we can do it despite -- if the Court will -- if you will

5 accept that as a proffer, that's the proffer of what his

6 testimony would be.

7     MS. HATHAWAY:  Okay.

8     MR. PARKER:  And I don't need any more than that,

9 than the ability to refer to it in my argument.

10     THE COURT:  So you accept that, and I can consider

11 that in connection with my ruling on the 5K 1.1 motion?

12     MS. HATHAWAY:  Yes, Your Honor.  I'm not aware of

13 that so I would want to talk to my agent, but I accept the

14 proffer ███████ would testify to what Mr. Parker just

15 said.

16     THE COURT:  Okay.  That's enough then.

17     MR. PARKER:  Then the other matter -- because it

18 was raised in your 5K motion and I think it needs to be

19 addressed -- is to the extent we want to argue and say that

20 there is something good about this defendant, why didn't he

21 just come in and surrender, why didn't -- as one of those

22 e-mails say, you need to surrender, we will take the death

23 penalty off the table and you need to surrender and you need

24 to be custody and we can work out a deal, you know, this back

25 and forth, you are never getting anywhere and you just need

1   to surrender.

2         And the testimony of ████████████ I will represent

3   would be that he ████████████ had a conversation on that

4   fact, and that ████████████████████ had a

5   conversation, and they feared that if ████████ Edgar did

6   come across the line and surrender within the months or at

7   the point in time, which is after this horrendous assault and

8   murder -- well, it wasn't a murder, you know, the Marines

9   killing Arturo -- that they believed, whether it's right or

10  wrong, it's just they believed that there would be a group of

11  sicarios sent to kill the family.

12        Passions were hot, they were heated, and this is

13  all in the time frame of after the murder, which is in '09,

14  beginning of '10, and we've got those months, and of course

15  he gets arrested later in '10.  But that's the explanation,

16  that's the proffer I am making.

17        THE COURT:  So ultimately all you are saying is

18  that's what ████████████ would testify about.

19        You probably don't -- you wouldn't have anything

20  to contest that?

21        MS. HATHAWAY:  That's right.

22        THE COURT:  Because it was a private

23  conversation with the family members.  Would you accept

24  that proffer?

25        MS. HATHAWAY:  I will, Your Honor.

1           THE COURT:  All right.  Okay.

2           MS. HATHAWAY:  And -- I'm sorry.

3           MR. PARKER:  And I really think that might obviate

4    the need ████████ to testify at all.  I would like to confirm

5    that, but -- you know, so we might obviate that need at

6    all.

7           Now, the other matter, since it's on the table, is

8    the conditions of the incarceration of Edgar Valdez by the

9    Mexican authorities.

10          I haven't had the conversation with Edgar Valdez

11   about his testimony because I just haven't, but we would try

12   to have that before we start the hearing.  But that's

13   something that I think we need to put on the record somehow,

14   how he was incarcerated for those five years.

15          THE COURT:  Could he do that in his allocution?

16          MR. PARKER:  He can, if you will consider that as

17   part of a basis for your 5K ruling.

18          THE COURT:  I don't prejudge anything.  Whatever

19   you want to present to me I will consider in your argument on

20   it.

21          But I don't know what he's going to say, so

22   I can't -- people have -- all I can say is people have done

23   that in the past, but it's usually about the federal

24   penitentiary here in Atlanta.

25          MR. PARKER:  Well, I know, and I think the federal

1   penitentiary here in Atlanta as compared to the Altiplano

2   Penitentiary in Mexico, it's sort of a garden place to be

3   here in Atlanta.

4            THE COURT:  Although we did have -- we did have one

5   defendant that was arrested I think in Thailand, and there

6   was some testimony about what his conditions were and would

7   I take that into consideration.  And, frankly, I don't have a

8   specific enough recollection to know how -- whether I did

9   and, if so, to what extent.

10           So it's not something I haven't heard before, and

11  I wouldn't prohibit it.

12           MR. PARKER:  Well, I understand.  I mean, I don't

13  really care to put him on the stand.  I'm just saying that's

14  the only issue I need to deal with, and since he's the one

15  who was there, not us --

16           THE COURT:  My understanding was that -- so I guess

17  what you are saying, because I think the government has

18  expressed a willingness to give him credit for his

19  incarceration by the Mexican authorities through the time of

20  today, that that would be deemed all pretrial detention even

21  though it was by foreign authorities.

22           MS. HATHAWAY:  That's correct.

23           THE COURT:  I guess what you are saying is that in

24  addition to that, you would like to argue for a greater

25  downward departure?

1          MR. PARKER:  Well, I would like you to weigh it as

2    an additional factor in considering your -- the downward

3    departure.  If you are not willing to do that, you are not

4    willing to do that.

5          THE COURT:  Well, I never say I'm not willing to do

6    something when I don't know what I am supposed to be willing

7    to do.

8          MR. PARKER:  Well, I think to put it

9    straightforward, I mean, it's been related to me ███████

10   ███████ and I've heard it different times in

11   communications from the defendant, that he was essentially

12   held in what we would describe as confinement in a small

13   cell, that he was beaten periodically, that he was given poor

14   food.

15          Keep in mind, the point is that he had great

16   knowledge of corruption on government officials in Mexico,

17   and on the one hand he was a public incarceration and they

18   couldn't just off him, if you will -- that's my argument

19   about the attention being directed to their corruption -- and

20   on the other hand, you know, they didn't care to really treat

21   him with kid gloves either.

22          So that's how it happened, and that's the point I'm

23   trying to make.

24          THE COURT:  I think if you want to make that point,

there has to be some record for that, and that record it

1    seems to me is only available from --

2            MR. PARKER:  The defendant.

3            THE COURT:  -- the defendant.

4            I'm not going say whether that would influence me

5    or not influence me, but if you want to make that, there has

6    got to be some factual predicate for it.

7            MR. MALOY:  Your Honor, I have been prepared to

8    argue the 18 U.S. Code 3585 issue about credit for the time

9    in Mexico, and I'm not certain -- and I have actually looked

10   at some case law, and the cases are all over the place on

11   this particular issue.

12           Credit, by statute, lies with the Bureau of Prisons

13   to award that credit.  And I'm not sure if the government is

14   saying that they have no objection to the BOP in the future

15   awarding credit for that time served, or if the Court should

16   give credit as part of its sentence.

17           And if the Court is inclined to do the latter, then

18   I believe that the only way that it really becomes effective

19   is if the Court says I was planning to impose a sentence of

20   X, and I am deducting from the sentence of X time Y equal to

21   the amount of time served in Mexico, and therefore the

22   sentence is Z.

23           If you just say, you know, and I'm giving you

24   credit for time served as part of your J&C, I don't think

25   that really affects the Bureau of Prisons.  They start from

1   scratch and make an investigation about whether or not he

2   was being held on any Mexican charges and so forth.  It's

3   messy.

4           MR. PARKER:  And he was being held initially on

5   Mexican charges.

6           MR. MALOY:  But never convicted in Mexico.

7           MR. PARKER:  No.

8           THE COURT:  Because they didn't have to do anything

9   if he was going to be extradited here.

10          MR. PARKER:  Right.

11          THE COURT:  Well, there are couple of ways I have

12  handled this issue in the past.

13          One is to deem that the sentence begins to run from

14  a date before the actual sentencing.  I have been told the

15  BOP doesn't like that, but if they are ordered to do that,

16  they do.

17          The other way would be for me -- if you make that

18  argument, for me to say, well, I would have given him X, in

19  my mind I'm going to give credit for that, and I don't put

20  anything on the record.

21          If I was the defendant, I would say that would

22  be fine because I have got another shot at BOP because

23  maybe they would think he didn't get credit for it,

24  but --

25          MR. MALOY:  People have tried that, and that's

1    where the case law comes out pretty clearly that the BOP --

2    I hate to say the BOP will absolutely positively do anything,

3    but from the litigation, if the Court says I am taking into

4    account your time served in a foreign jurisdiction pending

5    extradition, the BOP clearly says, okay, you got credit,

6    that's it.

7             THE COURT:  Okay.  I can do that.  I mean, since

8    you agree to that anyway --

9             MS. HATHAWAY:  That's right.

10            THE COURT:  -- I can make the record show that I am

11   doing that.

12            And that's 61 months, if I recall?

13            MS. HATHAWAY:  That's correct, Your Honor.

14            THE COURT:  Total BOP and federal detention;

15   right?

16            MS. HATHAWAY:  Sixty-one months in Mexico.

17            THE COURT:  Okay.

18            MR. PARKER:  He's been in BOP custody since --

19            MR. MALOY:  October.

20            MR. PARKER:  -- September the 30th of 2015.

21            THE COURT:  So it's only the 61 months in foreign

22   custody?

23            MS. HATHAWAY:  That's right.

             MR. PARKER:  Correct.

25            THE COURT:  All right.  I will do that.

```
1              MS. HATHAWAY:  And, Your Honor, I just wanted to
2    clarify one thing so that I don't make a mistake or get into
3    trouble with the Court.  In terms of the information --
4              THE COURT:  You couldn't get into trouble with me,
5    nor could Mr. Parker.
6              MS. HATHAWAY:  You are too kind.
7              In terms of the information regarding
8    Arturo Beltran-Leyva, that information came through an
9    intermediary who is not a blood relative of Mr. Edgar Valdez.
10   So I don't want to cause any concerns if I say it comes from
11   an intermediary, and maybe I will say a nonrelative.
12   
13   
14             MR. PARKER:  Right.
15             THE COURT:  Okay.  I don't think anybody has a
16   disagreement about that.
17             MS. HATHAWAY:  Okay.
18             THE COURT:  While we are all here, there is I guess
19   one guideline objection, whether he's a category one or
20   category two.  I don't think it really makes any difference,
21   does it?
22             MR. PARKER:  Not given the posture of the case.
23             THE COURT:  Right.
24             MS. HATHAWAY:  We agree, Your Honor.
25             MR. PARKER:  But we would rather have it identified
```

24

1    as one than two.

2         THE COURT:  Does that have an impact on his

3    security classification?

4         MS. ARCE-FLORES:  I believe it would, Judge.

5         THE COURT:  Although in a case like this --

6         MS. ARCE-FLORES:  But I think the way they identify

7    it for purposes of classification, that they give you a point

8    or you get points as per criminal history category.

9         THE COURT:  Right.  Okay.

10        MS. ARCE-FLORES:  Again, I don't know that it would

11   matter in his case.

12        THE COURT:  I understand the issue.  Okay.

13        Anything else?

14        MR. PARKER:  I just would like to have about five

15   minutes ███████████ so I can talk with him.

16        THE COURT:  Yeah, why don't you take ten or

17   fifteen.  Just let us know when you are ready.

18        MR. PARKER:  Thank you, Your Honor.

19        MS. HATHAWAY:  Thank you.

20        THE COURT:  And this is sealed.

21             (A recess is taken at 9:37 a.m.)

22                  -- -- --

23             (END OF SEALED PORTION

24                  -- -- --

25

1                    Monday Morning Session

2                      June 11, 2018

3                       10:02 a.m.

4                       -- -- --

5            (Interpreter Ian McColl is present and standing

6     by.)

7            (In open court:)

8            THE COURT:  Good morning.  This is the sentencing

9     in the United States v. Edgar Valdez-Villareal in two cases,

10    one is 09-CR-551 and the other is 16-CR-155.

11           Would counsel announce their appearances, please?

12           MS. HATHAWAY:  Yes.  Good morning, Your Honor.

13    Elizabeth Hathaway, Garrett Bradford, and Mike Brown on

14    behalf of the United States, and standing with us at counsel

15    table is DEA Special Agent Tom Jackson.

16           THE COURT:  Good morning.

17           MR. PARKER:  Good morning, Your Honor.

18    Wilmer Parker with Bruce Maloy and Adriana Arce-Flores on

19    behalf of the defendant, Edgar Valdez-Villareal.

20           THE COURT:  And good morning, Mr. Villareal.

21           DEFENDANT VALDEZ-VILLAREAL:  Good morning,

22    Your Honor.

23           THE COURT:  Mr. Villareal, there was prepared in

24    your case this long document that's called a presentence

25    investigative report that has a lot of information about the

1  facts of the case and the processing of the case, information

2  about the guidelines and some personal information about

3  you.

4        I just want to make sure, first of all, that you

5  have received that document.  Have you?

6        DEFENDANT VALDEZ-VILLAREAL:  Your Honor, yes,

7  I just read it.  I have it, but I read a little bit of it.

8        THE COURT:  All right.  So you have received it and

9  you have had a chance to review it?

10        DEFENDANT VALDEZ-VILLAREAL:  Yes, Your Honor.

11        THE COURT:  All right.

12        MR. PARKER:  We took it to him, Your Honor, and he

13  did in that sense receive it and he reviewed it in our

14  presence.  But we brought it back with us from USP-Atlanta.

15        THE COURT:  I understand.

16        And when you reviewed it with your lawyers, did you

17  have some discussion about the contents?

18        DEFENDANT VALDEZ-VILLAREAL:  Yes, Your Honor.

19        THE COURT:  I didn't see in the presentence report

20  any objections to the facts that were set out in the

21  presentence report.  There were some clarifications which

22  I intend to consider, unless there is any objection from the

23  defendant.

24        And I want to make sure that there aren't any

25  objections to the presentence report.  Are there any

1   objections from the government?

2         MS. HATHAWAY:  Your Honor, the government did

3   object to the criminal history category.

4         THE COURT:  But that's not a fact.  That's a

5   guideline objection.

6         MS. HATHAWAY:  Oh, the facts.  No, Your Honor,

7   there are no objections to the facts.

8         THE COURT:  And does the --

9         MR. PARKER:  We have no objections, Your Honor.

10        THE COURT:  And do you have any objection to the

11   few clarifications that the government made with respect to

12   the facts?

13        MR. PARKER:  No, Your Honor.  They were reviewed

14   with us, and we had no objections to the redactions that the

15   government proposed.

16        THE COURT:  Then I am going to accept the facts set

17   forth in the presentence report and will use those in

18   determining a reasonable sentence, as well as anything else

19   that is presented during the course of the hearing.

20        We will now move to the guidelines in the

21   presentence report.

22        If at some point we are going to use the

23   interpreter, I will have to swear him in, but my

24   recollection, Mr. Villareal, is that your English is very

25   good.  Are you comfortable moving forward in English?

1    DEFENDANT VALDEZ-VILLAREAL:   For now, yes,
2    Your Honor.

3    THE COURT:   All right.   If at any time you want
4    to use the interpreter, let me know and I will have him
5    sworn.

6    DEFENDANT VALDEZ-VILLAREAL:   Yes, Your Honor.

7    THE COURT:   So the guideline recommendations in the
8    presentence report with respect to the offense level is that
9    the combined adjusted offense level is -- the total offense
10   level is 51.

11   Is there any objection to the total offense level
12   recommendation of 51?

13   MS. HATHAWAY:   No, Your Honor.

14   MR. PARKER:   No, Your Honor.

15   THE COURT:   Then I will find that the total offense
16   level is 51.

17   The criminal history category recommended in the
18   report is one.   The government's position is that it should
19   be two.   In order for it to be two, the government would
20   have to make a showing that it is criminal history category
21   two.

22   So let's begin with whatever the government wants
23   to say on the criminal history category.

24   MS. HATHAWAY:   Yes, Your Honor.

25   Your Honor, in Paragraph 227, the PSR lists a prior

1   conviction of Mr. Valdez for possession of marijuana.  He

2   pled guilty, received a seven-year sentence that was

3   suspended, and placed on probation for five years.  That

4   probation was terminated in March of 2001.

5           Relying on information in the PSR, at Paragraph 21

6   the PSR notes that in 2000, which would be during the period

7   of Mr. Valdez's probation, that he began trafficking in

8   marijuana and soon developed cocaine customers in

9   New Orleans, Louisiana, Memphis, Tennessee.

10          And that starting -- excuse me, at Paragraph 22,

11  that starting in approximately 2001, that Mr. Valdez made

12  connections with cocaine distributors in Memphis and

13  Mississippi, and began sending them shipments of 20 kilos of

14  cocaine every three to four weeks.

15          And then at Paragraph 39 there is information from

16  a confidential source who indicated he had met Mr. Valdez in

17  August of 2001, and at the time Mr. Valdez indicated that he

18  had 80 kilograms of cocaine where they were, and that he was

19  expecting a shipment of 250 kilos of cocaine.

20          Now, to be clear to the Court, that August of 2001

21  is going to be after probation, but I would submit to the

22  Court given the information --

23          THE COURT:  Well, what specific information do you

24  have this began before March of 2001, the date that his

25  probation was discharged?

United States District Court
Northern District of Georgia

1          MS. HATHAWAY:  So what I'm relying on,

2     Your Honor, is in Paragraph 21 where the PSR says that

3     soon after early 2000 is what it says, in early 2000,

4     Mr. Valdez began distributing in marijuana, and then soon

5     thereafter began distributing in cocaine, and that by 2001,

6     at least by August, he's already up to 80 kilograms of

7     cocaine.

8              And I would submit to the Court that one doesn't

9     get to that level of cocaine if they had started after

10    March.

11             I don't have the exact time frame.  We just have in

12    the PSR that it was soon after 2000 that he started

13    trafficking in cocaine, but we know that by August he already

14    has 80 and is expecting a shipment of 250.

15             And I would submit to the Court then that those

16    facts indicate that his cocaine trafficking began sometime

17    before March of 2001, and therefore he would get criminal

18    history points for being on probation which would place him

19    in a category two.

20             THE COURT:  I give a lot of credence to the

21    evaluation that's done by the probation officer in this

22    case.

23             I understand your argument is that circumstantially

24    that there ought to be an inference that it occurred before

25    March 10th of 2001.  But for me that's not enough to make a

1   hardline determination that it actually did begin before the

2   discharge.

3           And so I'm going to overrule your objection to the

4   criminal history category number one with the following

5   observation.  That even if I was wrong on this, that it

6   wouldn't impact what the Sentencing Guidelines recommend, and

7   therefore there is sufficient -- there is a sufficient

8   recommendation to give me the authority and discretion that

9   I need to impose a reasonable sentence.

10          So I am going to overrule the objection.

11          MS. HATHAWAY:  Yes, Your Honor.

12          THE COURT:  So with that finding and ruling on the

13   objection, I find that the defendant's criminal history

14   category is one, and that the custody guideline range is

15   life, and that his fine guideline range is $25,000 to

16   $40,500,000.

17          Are there any objections to those findings?

18          MS. HATHAWAY:  No, Your Honor.

19          MR. PARKER:  No, Your Honor.

20          THE COURT:  Then the government has moved for me to

21   consider a reduction under 5K 1.1, and that motion, it's

22   probably time to hear that.

23          So let's begin with the government's presentation

24   on their 5K motion.

25          MS. HATHAWAY:  Yes, Your Honor.

1         The government has moved for a departure under

2    5K 1.1, and is asking the Court for a nine-level departure,

3    which would take Mr. Valdez from an offense level 51 down to

4    a 42.

5         It's basically that guideline that would allow

6    the Court to sentence Mr. Valdez to a term of years as

7    opposed to lifetime.  Obviously the guidelines are advisory,

8    but it would move the advisory guidelines to 360 to life

9    instead of being an advisory guideline of life.

10        And, Your Honor, the government has set forth in

11   its 5K motion the basis for this recommendation that the

12   Court grant a 5K departure.  I did want to highlight for the

13   Court what has happened since Mr. Valdez has been returned to

14   the United States.

15        Mr. Valdez got to the United States on September

16   30th, 2015.  He arrived in Atlanta in early October.  Almost

17   immediately Mr. Valdez expressed an interest in pleading

18   guilty and talking to the government.

19        The government was reluctant at first, but

20   ultimately decided it would listen to what Mr. Valdez had to

21   say.  And within three months approximately of his arrival in

22   the United States, Mr. Valdez entered a guilty plea, and then

23   debriefed with the government.

24        He debriefed for about two days, giving information

25   about his various criminal activities, potential for

cooperation.  A lot of the information he had at that point was stale, but we did believe that it was truthful.

One of the things he talked about as well was information he had about Alfredo Beltran-Leyva.

Mr. Alfredo Beltran-Leyva was a defendant in a case being handled out of the District of Columbia. Mr. Valdez debriefed regarding Alfredo Beltran-Leyva and was willing to cooperate.

He was transferred up to the D.C. area. About a month before trial his name was disclosed in open court as someone who was willing to testify in that trial.

Ultimately Alfredo Beltran-Leyva pled guilty. However, again, Mr. Valdez's name and summary of his testimony was given to the court, and my understanding is that some of his information was used at sentencing.

So I wanted to highlight that for the Court. I think that does qualify as substantial assistance.

There is also, as we mentioned, a potential that he may be able to assist in future right now unmature cases.  We are not asking the Court to consider that at this time.  We did put it in our memo, but I'm not asking the Court to consider that right now, but I am asking the Court that we reserve the right to file a Rule 35 should that cooperation come to fruition.

1        THE COURT:  Mr. Parker?

2        MR. PARKER:  Your Honor, in addition to the

3   information that government counsel has provided, I would

4   like to discuss additional facts.

5        As the Court is aware, as early as May of 2004, the

6   defendant, Edgar Valdez-Villareal, through counsel,

7   communicated with Department of Justice officials in the

8   Southern District of Texas in the Eastern District of

9   Louisiana.  Of course, the Eastern District of Louisiana case

10  was Ruled 20 here before this Court.

11       In this communication, the Department of Justice

12  specifically in connection with potential resolution of

13  outstanding charges at that time, which I note do predate the

14  Atlanta indictment, solicited the assistance of defendant,

15  Edgar Valdez, to effectuate the capture, arrest, and

16  detention of Joaquin Chapo Guzman Loera, also known as

17  Shorty, and Arturo Beltran-Leyva by Mexican and/or U.S. law

18  enforcement authorities.

19       Subsequent to that solicitation and some years

20  later, Mr. Valdez, the defendant, who was in Mexico, having

21  left his home area of Laredo, Texas, sometime in 2000, and

22  who had become affiliated with first the Sinaloa cartel

23  headed by Joaquin Chapo Guzman, and later the Beltran-Leyva

24  cartel which split off from the Sinaloa cartel, engaged in

25  unquestionable high-level criminality that is evidenced by

1   not only the indictment in this case, but by the facts
2   reflected in the PSR.

3          Because of that activity, he actually had the
4   possible ability of effectuating the capture and arrest of
5   those two individuals I previously identified, Chapo Guzman
6   and/or Arturo Beltran-Leyva.

7          But the evidence reflects that the Beltran-Leyva
8   cartel appears to have developed at the end -- or the
9   beginning, I should say, of 2008 as a result of a
10  disagreement between Alfredo Beltran-Leyva -- excuse me, as a
11  disagreement between Arturo Beltran-Leyva and his brothers
12  over the capture of Alfredo Beltran-Leyva, the individual
13  that Ms. Hathaway just identified as being subject to the
14  prosecution in Washington, D.C., that Mr. Edgar Valdez was to
15  be a witness against.

16         He had been arrested by Mexican authorities, and of
17  course ultimately he was extradited here, but it took some
18  time.  But because of that time frame there became this
19  division.

20         The evidence presented before the Court is that in
21  2008 and into 2009 and into 2010, Edgar Valdez-Villareal
22  communicated via third parties with U.S. law enforcement
23  authorities, and those authorities, based on the documents
24  submitted to the Court, include the Drug Enforcement
25  Administration out of San Antonio, the Drug Enforcement

1    Administration out of Mexico City, the FBI office in McAllen,
2    Texas, the FBI office in the Embassy at Mexico City,
3    Immigration Customs and Enforcement agents in the southwest
4    border area, as well as possibly communications with
5    intelligence services of the United States.

6           And through these communications various activities
7    occurred that have been documented to the Court.  I refer to
8    those in addition, some of which are referenced by the
9    government in its 5K motion.

10          THE COURT:  But just stopping for second, during
11   the period of time of those communications, wasn't the
12   defendant actively engaged in transporting and arranging for
13   transportation and distribution in the United States --

14          MR. PARKER:  Yes.

15          THE COURT:  -- in Atlanta, Memphis and Mississippi
16   massive amounts of cocaine?

17          So on the one hand he's trying to have these
18   communications.  On the other hand, he is in some cases
19   arranging for him and for others tons of controlled
20   substances to be imported into the United States while he's
21   having these side discussions that might benefit him.

22          MR. PARKER:  That's correct.  But they also not
23   only benefit him, but they also benefit the government of the
24   United States and law enforcement, not only in law
25   enforcement, but in national security.

1          Because we need to deal, quite frankly, with the

2    absolute recognition of what the Mexican cartels pose to

3    national security to the United States of America.  It's not

4    just a law enforcement matter.  It is a national security

5    matter.

6          THE COURT:  Of which the defendant presents exactly

7    the same risk --

8          MR. PARKER:  Correct.

9          THE COURT:  -- and continued to present it while he

10   was trying to get some concessions from the government.

11         MR. PARKER:  Correct.  That's absolutely correct.

12         And in making those contacts with the government,

13   the United States government, and engaging in the activities

14   he engaged in with the United States government, he was each

15   and every time putting his life in jeopardy.

16         And you can say on the other hand his life was

17   always in jeopardy.

18         THE COURT:  Because it was.

19         MR. PARKER:  Because it was.  But it's in jeopardy

20   from different reasons as well.

21         THE COURT:  It's all choices that people make in

22   life.

23         MR. PARKER:  I got it.  But the facts are what they

24   are.  And the facts are that he was integral in assisting

25   U.S. law enforcement that later communicated with Mexican

1  authorities, keeping in mind the massive amounts of
2  corruption in Mexico.

3          Indeed a *Los Angeles Times* article in 2011
4  identified the Beltran-Leyva cartel as having thoroughly
5  infiltrated and corrupting the Attorney General's Office
6  of Mexico, paying up to $450,000 a month to the then
7  Attorney General of Mexico back in the '08, '09, '10 time
8  frame.

9          The problem is that any effort by this man in
10  helping the United States that's disclosed to Mexican law
11  enforcement officers who are corrupt is his effort of signing
12  his own death warrant.

13          There could be no effort in keeping that
14  information from the Beltran-Leyva brothers or from Guzman
15  and the Sinaloa cartel or any other cartel, be it the Zetas,
16  the Gulf cartel, whomever, because the greatest problem in
17  the country of Mexico is the lack of integrity in any of its
18  government functions, including its judiciary.

19          So getting back -- and the Court is well aware, and
20  you are absolutely correct, but in that regard, in addition
21  to the activities that have been detailed, one of the
22  significant activities was the disclosure of the existence
23  through information received by this defendant that the
24  cartels had identified undercover DEA agents in various
25  localities within the country of Mexico:  Photographs, names,

1   identifications.

2          That information was submitted, caused to be

3   submitted by this defendant through intermediaries to

4   U.S. law enforcement so that those individuals could be

5   protected and removed from harm's way.  And in doing that,

6   that also was risky.

7          Everything was risky, I understand that, and that's

8   the point I'm trying to make to the Court.

9          Now, the Court has raised a very central issue

10  here, and the government rightfully raised in their motion,

11  5K motion:  Well, why didn't defendant just walk across the

12  border and surrender?  Why didn't he just give up, surrender

13  into custody, try to go through the normal process that one

14  would to negotiate a resolution of his criminal problems,

15  which included by then the Atlanta case that this Court has

16  sat on throughout the years?

17         And the answer I represent to you is because,

18  as we know from the publicity and from the events,

19  Arturo Beltran-Leyva was killed in fire fights with

20  Mexican Marines as a result of information that had been

21  delivered by this defendant to U.S. law enforcement

22  authorities.

23         Had the defendant -- and I have represented to

24  the Court as a proffer, had the defendant -- it was

25  discussed by the defendant with his family about

surrendering, but it was believed by them that had he done
so, he would put himself not only in jeopardy of being
killed, but his whole entire family. Not just his immediate
family -- mother, father, brother, sisters -- but the
extended family as well, many of whom are are present in this
courtroom today. And that is the reason that did not
happen.

Now, that discussion happened in the early part of
2010. It does reflect -- it is reflected in the record that
this defendant was arrested in 2010 by Mexican authorities
and incarcerated, incarcerated in Mexico, and it had been
publicized that he was an individual who had knowledge of,
and I represent to the Court has discussed the knowledge with
the government of corruption with high-level government
officials of Mexico.

Now, there was a request by the defendant through
his counsel to facilitate his extradition to this Court to
face these charges, representing an indication he wanted to
cooperate.

In fact, previous United States Attorney John Horn,
who then was an Assistant U.S. Attorney, did travel down to
Mexico City and engage in conversations and communications
with not only the defendant and his counsel, but also with
Mexican officials. And the Court has been presented with
documentation of some of that communication, and the Court

1  has been presented with documentation of communication with

2  the then Mexican Attorney General.

3          Also the Court has been presented with

4  communication from the U.S. Embassy in Mexico that Mexico

5  controlled when or if the defendant would be extradited back

6  to the United States.  He was not extradited for 61 months,

7  during which time he was held in prison in Altiplano, Mexico,

8  and at least in some communication was held in very onerous

9  conditions.

10          By the time he was extradited, his historic

11  knowledge of events and activities was, in fact, as the

12  government has said, stale, but it wasn't because he didn't

13  try to get extradited sooner than later.

14          The conduct and activities reflected in the PSR,

15  the conduct that the Court has rightfully identified, is

16  conduct endemic to the activities of the Mexican drug

17  cartels, which really is a Mexican drug war infused with all

18  kinds of issues over and above the simple desire to make

19  millions and millions of U.S. dollars.

20          The violence -- and the violence occasioned in

21  Mexico was a war, not unlike wars in any locales in our

22  world.  It's a war over drugs.  It's not a war, as coined by

23  President Nixon, on drugs.  It's a war over drugs.  And

24  that's why that poses such a national security threat to our

25  country.

1       While the government's recommendation as to a
2   sentence less than life is certainly appreciated, its
3   recommendation of almost 50-something years to a
4   44-year-old man is the functional equivalent of life, and
5   we would represent, Your Honor, is not an appropriate
6   position.

7       It should be something of a more substantial
8   nature, more substantial because of not only the conduct
9   that I have previously described, the conduct that the
10  government has referenced, but it must be of more
11  substantial nature to show others that there is a reason
12  to put one's life in -- to try to make some mitigation of
13  one's own conduct.  That's why 5K motions are designed in
14  the guidelines.

15      I go back to the DEA agents, Your Honor, the DEA
16  agents who were identified, who were not part of the
17  negotiation or leverage or anything, and disclosed, and the
18  families of those DEA agents.  Had they been killed, any one
19  of them, the horrific nature of the murders of those DEA
20  agents would -- yes, it would be part of the line of duty,
21  and they certainly signed up for some of that.  But my point
22  is that there is not just an evil man sitting in this
23  courtroom.  There is more than that.

24      He is not the evil -- as evil men were in
25  Arturo Beltran-Leyva or in his brother Alfredo Beltran-Leyva

1  or El Chapo Guzman.  No, he's a man who found himself in a
2  situation that he couldn't control, and he wanted to get out,
3  but he couldn't get out without causing great risk, indeed
4  possibly death, to the members of his family.

5           THE COURT:  Well, Mr. Parker, let's keep
6  perspective here.

7           Let's just focus on the DEA agents.  The DEA
8  agents ultimately, well, have always been at risk, because
9  the work that they do -- and people have written books
10 about the work that they do -- is inherently risky when you
11 have to go into a foreign country to try to stop evil.
12 And the fact is that they were put at risk because of the
13 defendant.

14          That if, in fact, it is the serious issue that you
15 say it is -- and I agree that it's not just the safety and
16 the well-being and health of the people in the United States
17 who are being sold these terrible, destructive products, but
18 it is a national security risk as well.

19          But the reason why everybody is willing to take
20 this risk in Mexico and the reason why there is this war, the
21 war is over money.

22          The war, everything that I've read, including when
23 I was United States Attorney, is that it's all about who is
24 going to control the greater part of what's being transported
25 and distributed within the United States, not -- part of it

1   I think is just raw power.  I think most of it is the more
2   you control, the more money you make.

3           And because they were willing even to war amongst
4   themselves and putting at risk not just themselves but their
5   families and their neighbors and their communities and the
6   honest law enforcement officers who were trying to stop what
7   was going on in Mexico separate and apart from those that
8   might be corrupt, and ultimately in order to protect
9   transportation at our borders that would prohibit those drugs
10  from coming in we send willing American law enforcement
11  officers to go and engage in dangerous work in a country
12  where they shouldn't have to go.

13          And why do they do that?  Because at the very
14  cartels, including the defendant's, that we have been
15  harping on for the last fifteen minutes, they have put
16  their country, their government, their people, their
17  families, and themselves at risk.  And our response to that
18  is if you want to do that, do it at someplace other than our
19  country.

20          So we can't parcel out there are moments when he in
21  his own self-interest tried to engage in conduct that would,
22  in fact, benefit himself against the overwhelming information
23  in this PSR and the case involving Mr. Flores as to what
24  exactly he did in the United States to the safety and
25  well-being of citizens.

1          Now, the government I think recognizes that

2    there have -- that those moments are entitled to some

3    credit.  But I don't think the guidelines and a departure are

4    intended to say let's go find a guideline range that would

5    help him and go down there.

6          The question is -- because I'm not sentencing just

7    this case.  I've sentenced cases over the past 14 years, and

8    there has to be some reasonable proportionality to the amount

9    that you are going to reduce from a sentence.

10         And the reason why it's hard to do it in this case

11   is because this PSR is just littered with the evil conduct

12   that you have acknowledged and I think even the defendant has

13   acknowledged.

14         The reason why we start out at life is because this

15   is -- and I think you will agree with this -- one of those

16   rare instances, maybe only the second guideline life sentence

17   that's been recommended in my tenure on this court -- and

18   I have had a lot of serious cases -- because what he has done

19   is dangerous, it ruins American communities, it kills

20   people.

21         And it's in that context that we are trying to

22   carve out some credit to give him some benefit for the times

23   when, even though self-servingly motivated, he in fact did

24   some right things.

25         But the one thing he never did was walk across the

1   border and say I have put myself in an untenable situation,

2   I can't put up with it anymore.

3            He's a very bright man.  I've believed that from

4   the moment I first was assigned this case and read the

5   background.  And I think he's a very good businessman, which

6   is the reason why his cartel was successful.

7            And I think that in his calculation as to what he

8   would do in providing information to the United States, he

9   deployed those two things, his intelligence and his business

10  savvy, to try to strike the best deal that he could.

11           And from what you have even said -- and what

12  I think is true -- the best deal from him was to extract

13  himself from this business and get some protection and try to

14  get some help to protect his family.  But that didn't

15  happen.  But it could happen.

16           So I understand all of your arguments.

17  I appreciate them.  I think you are doing the kind of job

18  that I appreciate in trying to look at all aspects of a

19  sentence.

20           But this is a very serious case, which makes it so

21  hard to credibly argue for a reduction, which what the

22  government is willing to make in my mind has been fairly

23  generous and puts him in a place where it's not just the

24  sentence, but one of the advantages of the 15 percent

25  reduction is that he's going to go into an environment

where it will help the authorities that are responsible for his incarceration and I think will help people that want to cooperate to say that if you can get below the life level and get a term of years, you can reduce it significantly.

Because 15 percent of 42 is more than 15 percent of 22, so he does get a benefit if he can behave himself in prison and get the 15 percent reduction, and that's available to him.

And that's totally up to him, and I think that that's one place where he can be motivated not to engage in the evil that he's done in the past, but to engage in the good that he's possible of engaging in in the future.

And I just -- I understand what you are saying, but the question is what's fair in the context of this case and what's fair in the context of other cases that I have sentenced.

MR. PARKER:  Well, I'm certainly not standing before the Court to question the Court's comments or to argue with the Court.  I have tried to make a credible representation to the Court.

THE COURT:  Well, I think you have.

MR. PARKER:  And as the Court well knows, I have been in the business of criminal justice since the mid '70s, and I was prosecuting many of these cases, some of these

1   cases as the Court well knows, and I'm not about to suggest

2   that the facts as the Court has described them are not the

3   reality of the circumstances that this defendant finds

4   himself before this Court.

5          But what I am trying to do on his behalf, but

6   also on behalf of the system -- to be honest, it's on

7   behalf of our system as designed by Congress and as always

8   been recognized in American jurisprudence -- which is

9   prosecutorial discretion and in the sentencing regime of

10  our country, our federal sentencing regime, the recognition

11  of a downward departure for assistance and cooperation to be

12  measured against the conduct that the defendant in question

13  is being held accountable for.

14         And you are absolutely correct, it's a difficult

15  judgment as to what is the quantitative value of that

16  downward departure assistance that should be imposed in this

17  case, and that's your job, not my job, and I don't envy the

18  Court in that regard.

19         But I will say this, and then that will conclude my

20  remarks.  For whatever it's worth, and I'm not dismissing

21  this, no matter how much cocaine one deals with, no matter

22  how much marijuana one deals with, or heroin, or whatever the

23  controlled substance is, the guidelines provide for level 38

24  for that conduct.

25         Now, enhancements come along, enhancements that

1   were reflected in this PSR, and those enhancements involved

2   conduct that clearly was in Mexico.

3          I'm not dismissing that.  I'm not saying it's not

4   something to be considered.  I'm just saying that's where it

5   was; okay?  And --

6          THE COURT:  But it was in Mexico because he decided

7   to leave Laredo.

8          MR. PARKER:  I got it, I got it.  But, you know, it

9   wasn't here, it really wasn't, and it really wasn't part of

10  the murder and mayhem in the United States.

11         Now, that doesn't mean, because the

12  Eleventh Circuit -- we all understand agency principles and

13  we all understand reasonable foreseeability, and we all

14  understand how the law applies that in an appropriate way to

15  others to be held accountable, and, yes, the Court was right

16  in saying he was a member of the cartel, he was a member of

17  the group and the people who put these DEA agents in --

18  yes, all of that is correct.  It's correct based on the

19  arguments of agency and reasonable foreseeability and all of

20  that.

21         But he specifically disclosed those facts at that

22  point in time so that those individuals would not be killed,

23  to be blunt; okay?

24         That was his life, that was his doing, his

25  decision, whether it's motivated for selfish purposes or

whether it's part of some innate sense of right and wrong that was instilled in him by his family.  And the Court is going to hear some representations from his family, I know that.

But my point is it happened.  Was that of value? I would think it was of value.

Anyway, I have sort of made my arguments, Your Honor.

THE COURT:  Well, I appreciate it.

MR. PARKER:  And in that regard, we would recommend that the sentencing level be -- that the 5K motion be granted and that the Court -- I'm not -- to be honest, I wasn't aware there was a footnote in the guidelines that reduced the calculation down to 43 as a matter of law, I guess.  But we are arguing that it should be reduced to a level 38, and that the sentence be within that guideline range.

THE COURT:  All right.  Thank you.

MR. PARKER:  Thank you.

THE COURT:  Would the government please respond to Mr. Parker's remarks?

MS. HATHAWAY:  Your Honor, I don't think I have any response in terms of the 5K.  If we are moving to a reasonable sentence, I'm happy to address that.

But I think the Court has identified the government's concern just in terms of the 5K as for the

1    conduct that occurred before Mr. Valdez was extradited.

2              THE COURT:  What's your response to his disclosure

3    about this known -- this information that was known in Mexico

4    about the identity of DEA agents, including some that were

5    undercover?  Because I didn't see much emphasis, if any, in

6    your memoranda.

7              MS. HATHAWAY:  No, Your Honor.  My understanding --

8    actually may I have just one moment, Your Honor?

9              Your Honor, thank you.

10             The government acknowledges that that information

11   was given to U.S. authorities, but there was no

12   knowledge of -- the United States was not able to verify

13   whether there were any hits put on any of these agents or

14   whether there was any specific threats made to these agents

15   beyond the information of who they were.

16             THE COURT:  Well, I mean, that might be true, but

17   it has to be incredibly valuable to the DEA and other law

18   enforcement to know that that could have happened -- or

19   that that did happen, they believe those identities were

20   known.

21             MS. HATHAWAY:  That's correct, Your Honor.

22             THE COURT:  What we haven't said is that they might

23   have taken -- in fact, I would suspect that law enforcement

24   once aware of that took some precautions to make sure that

25   their safety was protected.

1     MS. HATHAWAY:  That's correct, Your Honor, I would

2 assume the same as well, and certainly that would be valuable

3 information.

4     THE COURT:  So where does that come in?  If you

5 haven't considered that yet in your recommendation and it

6 is conduct that occurred before he was apprehended or at

7 least extradited to the United States, isn't that important

8 enough to maybe reconsider the recommendation that you have

9 made of nine points based upon the information that was in

10 your motion, which is the only information that I would

11 consider.

12     Although I think there is something to whether

13 or not he ought to get some incremental additional benefit

14 for this particular disclosure that was made, for which he

15 might have gotten some benefit as far as the way we felt

16 about him, but there doesn't seem to be any immediate

17 benefit unless it was to have all of those agents

18 withdrawn to make it easier to conduct drug-trafficking

19 activities.

20     MS. HATHAWAY:  Your Honor, I don't think it causes

21 me to reconsider the recommendation, because we are going

22 from, as the Court pointed out, a life sentence to something

23 other than life, and that's really to me the value of sort of

24 the totality of all of the information that Mr. Valdez

25 gave.

1        For exactly what the Court pointed out, as much as

2   that is important information, as well Mr. Valdez at the same

3   time is still trafficking in drugs, he's still the exact

4   threat that he was before where, I would posit to the Court

5   still, as the Court says, he has the business acumen to be

6   structuring a situation where his competitors are being taken

7   out by law enforcement while he at the same time is in

8   discussions with the government to either come in -- or,

9   rather, first, not to have any charges, to have the charges

10  dropped, or then was offering to come in to plead to a

11  five-year sentence.

12       And I think what he was doing, I think the evidence

13  shows, is that he was trying to create a situation where his

14  competition is out, and he is basically untouchable at least

15  for his past conduct, that he's starting afresh as the leader

16  of whatever organization would be left.  And so he's doing

17  that at this time period for his own gain.

18       So, yes, the information about the DEA agents is

19  helpful, but, again, we are taking everything into account

20  and saying because of his cooperation, we think the Court

21  should depart to a level that would frankly get to from 360

22  to life, and we were really targeting the number of levels to

23  get the Court to an advisory guideline range that would be

24  something other than life, although life is still at the

25  maximum.

1          That any incremental value, I don't think that

2    says, well, you were willing to go to 42, now you should go

3    to something less, because what we are looking at is the

4    ability for the Court to give Mr. Valdez a term of years, but

5    not a guideline sentence -- frankly, I think the next level

6    down is 324 to 405, if I'm not mistaken, Your Honor, and I

7    don't think that that is a reasonable sentence for

8    Mr. Valdez.

9          So what the government has done is looked at

10   everything and not incrementally you get so much for this and

11   so much for this and so much for that.

12         So, Your Honor, I think the totality of the

13   circumstances for all the reasons the Court identified would

14   still -- taking into account that information, the

15   government's recommendation would still be for that

16   nine-level downward departure to get to a level 42.

17         THE COURT:  The way I approach downward

18   departures -- and I think ultimately that both parties in

19   this case have looked at where you land in the guidelines

20   and not necessarily what is the proper reduction based upon

21   the quality and the quantity of the cooperation.

22         And I think the government has acknowledged that

23   they didn't want to go down an additional point because that

24   would cap it at 405, because I think everybody knows that

25   I believe in the guidelines and they have substantial

1   influence on me, and I told that to Mr. Villareal when

2   I accepted his pleas.

3          So for me it's what is the proper and fair amount

4   based upon the quantity and quality of the defendant's

5   cooperation in this case.  And I think quality and quantity

6   in this case is motivated by mixed motives.

7          To some extent I think the defendant, you know,

8   offering to cooperate did so because he thought that that's

9   what a responsible person would do and would like to get

10  credit for the help he tried to give the government.

11         And there are cases where somebody cooperates and

12  I believe that they have had a cathartic moment and believe,

13  in evaluating their life, that it's time to right wrongs, and

14  that's evident from the quantity and quality of the

15  cooperation that they give, and is not often preceded by some

16  negotiations where you do try to get some personal benefit

17  with respect to how you are going to be treated by trying to

18  reach a deal on what exposure you have.

19         Here the cooperation occurred after he had been

20  finally extradited but first having been arrested and now

21  knew that he was going to be in U.S. custody, and that in

22  calculating what was in his best interest, it was best to

23  find some information that would be helpful for which he

24  could be given credit.

25         But I believe that Mr. Villareal is a bright person

1  and I don't think that he does anything without a

2  calculation, and that that calculation is what's the risk and

3  what's the benefit.

4      I don't think that this is a defendant who has

5  decided that it's in the best interest of the people, the

6  citizens of the United States and law enforcement generally

7  to attack what I think Mr. Parker has done a good job of

8  describing, which is a terrible problem in Mexico and a

9  terrible problem in the United States, which regrettably

10  almost always originates in Mexico with cartels.

11      So in looking at what would be -- whether you look

12  at it as a percentage or you look at it in raw numbers, one,

13  I believe that he is entitled under 5K 1.1 and the criteria

14  that I'm supposed to apply, that he is entitled to a

15  reduction under 5K 1.1, because the information he provided,

16  in my assessment of the information provided in the motion,

17  was useful, but not to the extent that I have seen other

18  cooperation useful.

19      I accept from the government that his information

20  was truthful, but I'm not convinced that it has been entirely

21  complete, but I'm going to assume that it was more complete

22  than incomplete.

23      The nature and extent of the defendant's

24  assistance.  For the same reason, I believe that the nature

25  of it was to provide substantive information that was helpful

1    to the government, including with one prosecution in the

2    District of Columbia that ended up being shorter and resolved

3    quicker as a result of the assistance and the disclosure of

4    the defendant's assistance in that case.

5              I do think that his cooperation put people at risk,

6    including himself.

7              And the timeliness I don't think is a strong

8    motivation, because it didn't occur until he was finally

9    brought to the United States and it became clear that he was

10   going to be prosecuted and punished for what he did.

11             So looking at it from those criteria, I believe

12   that they balance in favor of granting the motion, which I am

13   going to grant.

14             And with that same analysis of whether I look at it

15   as a raw number or look at is as a percentage off of the

16   original guideline recommendation of 52 offense level,

17   I believe a nine-point reduction is fair and reasonable in

18   the context of others that I have given, and I am granting

19   the motion for a nine-point reduction.

20             Which reduces his total offense level now to 42,

21   which provides for a custody guideline range of 360 months to

22   life.

23             MS. HATHAWAY:  Your Honor, just to -- Your Honor

24   had mentioned the offense level was 52.  It was actually 51.

25             THE COURT:  Fifty-one, minus nine, still takes us

1   to --

2          MS. HATHAWAY:  Yes, Your Honor.

3          THE COURT:  My math is correct.  My recollection

4   was lacking.  It reduces him to a -- a nine-point reduction

5   reduces him to an offensee level of 42.

6          So with that ruling, let's now move on to the next

7   portion of the proceeding, which would be to hear anything in

8   extenuation or mitigation.

9          After that is presented, Mr. Parker, whoever you

10   want to call, want me to hear from, I then would like to hear

11   from you as to what you think would be ultimately a

12   reasonable sentence in the case.  And then I will hear from

13   Ms. Hathaway.

14          Then the last person I would like to hear from is

15   Mr. Villareal.

16          MR. PARKER:  Your Honor, at least two family

17   members would like to address the Court, if they may?

18          THE COURT:  Yes.

19          MR. PARKER:  I would like to ask Ms. Karla Valdez

20   to approach the lectern?

21          Your Honor, Ms. Valdez is the sister of the

22   defendant, and she also is an assistant district attorney in

23   south Texas.

24          THE COURT:  That is your job in south Texas?

25          MS. KARLA VALDEZ:  That's correct.  Good morning.

1        THE COURT:  Good morning.

2        MS. KARLA VALDEZ:  As previously stated, my name is

3   Carla Valdez, Judge.  I'm Edgar's baby sister, number eight

4   for the family out of eight children as I have six sisters

5   and one brother, all of us present here today.  Including our

6   parents, nine out of the 27 nieces and nephews, those of

7   which includes Edgar's kids, which I will get to in a few.

8        Your Honor, we come from humble beginnings, from

9   hard-working parents, who although only have a third-grade

10  education themselves have taught us more about life than any

11  educated person ever could.

12       They taught us strong values and morals, integrity,

13  discipline, respect, generosity and kindness, amongst many

14  others.

15       They taught us to love and honor God, to always

16  help and give to others, and taught us that nothing in life

17  comes free and that one has to work very hard to achieve

18  success.

19       As mentioned, I am a prosecutor for the State of

20  Texas, and so is my husband.  Many of my siblings are

21  self-employed and have their own businesses, and the rest

22  work for those that do.  We are a tight-knit family.  We are

23  not career criminals.  Our parents never taught us that.

24       Our parents instilled fear in them and fear in

25  God.  We were all afraid of our parents growing up.  I'm 34

1    years old right now, and sometimes I still am afraid of

2    them.  I guess that goes back to respect, Judge.

3                THE COURT:  I don't know.  You should always be

4    afraid of your parents.

5                MS. KARLA VALDEZ:  Yes.

6          My brother strayed from the flock, yes.  But no

7    matter how much one may lose sight of their values, at some

8    point in their life one always comes back to them, and Edgar

9    definitely has.

10         He's a father of six kids:  Victoria 18, Edgar 16,

11   Abel 13, Arturo 11, Sofia 10, and Jesus 7.  And although he

12   has been away from them, he has always been attentive to them

13   and to their education, always instilling good moral

14   character in them.

15         Each one of his children have excelled tremendously

16   in school because of their dad, because he has encouraged

17   them and told them that education is the most important tool

18   in life.

19         Victoria, for example, the eldest, graduated from

20   high school just last year with top honors and is now

21   attending the University of Texas in San Antonio.

22         And his son Edgar earned the highest score of all

23   eighth graders -- sorry, Judge -- in his standardized science

24   exam, and he has been continuing to excel since and is in

25   line to graduate high school next year.

1    All the rest, they are all following in those very

2 same steps, Judge.

3    Our brother Edgar is a good-hearted man.  He's a

4 man of few words, but with a very positive attitude and a

5 good spirit.

6    He's a jokester at heart, with a great sense of

7 humor.  He has always been very likable.  He loves to make

8 people laugh, and he does it well.

9    He's a man who cares for the well-being of others,

10 who always has been giving and kind to others, who has

11 recognized his wrongdoing, and has gotten to know God and His

12 word.

13    I was just visiting with him this past weekend,

14 Your Honor, and I was telling him about a disagreement I had

15 had with another family member, and I was arguing and I was

16 telling him how I was right and she was wrong.

17    And as much as I tried for him to see my side, all

18 he said was one thing:  *No tiene Jesus en tu corazon.  Que no*

19 *sabes perdonar.*

20    THE COURT:  Can you help me with that?

21    MS. KARLA VALDEZ:  Yes.  He said you don't have

22 Jesus in your heart, that's why you don't know how to

23 forgive.  He made me feel this small, because him in battling

24 everything that he's going through right now minimized it to

25 just one thing, Judge.

1   He is a God-fearing man, and he always has been,
2   but right now more so than ever. He's a transformed man,
3   Judge, that will one day, if given the opportunity, stand and
4   abide in society and help others not fall in the same steps.
5   His testimony, Judge, will be a positive one, one that will
6   serve others, but most importantly to him, one that will
7   serve the Lord.

8   We have a father, Your Honor, who has dedicated
9   maybe the last fifteen years of his life, maybe even more, to
10  going daily to the eucharistic chapel, I mean, Monday through
11  Sunday. Sometimes there is family gatherings and he won't
12  go. He has dedicated the last years of his life, Your Honor,
13  to going and just praying.

14  Sure, he prays for all of us, but I could assure
15  you that most of his prayers are for his son Edgar and for
16  this very day, Judge. For this very day.

17  And what keeps us believing in our brother and
18  loving him is the fact that he is a good person, that he came
19  from a good home, and we wish more than anything in the world
20  that you, the man who decides his fate, could know him just
21  as well as we do.

22  Today, Your Honor, we plead for compassion and for
23  mercy. We plead for compassion and mercy for him, for his
24  children, and for us, his family.

25  Thank you, Your Honor.

1          THE COURT:  Can I ask you a couple of things?

2          MS. KARLA VALDEZ:  Of course.

3          THE COURT:  First, I believe this is probably the

4   hardest court presentation you have ever had to make.

5          MS. KARLA VALDEZ:  Definitely.

6          THE COURT:  And I understand that.

7          Sentencing, as you know even from your perspective,

8   is a really difficult thing to do, and I listen hard to what

9   people say in the courtroom.  And you have done that

10  eloquently, and I appreciate you having the courage to do

11  this.

12         But I also look really hard at the information

13  that's in the PSR and the other information presented to me

14  during the course of a sentencing proceeding and before.

15         Here is what I don't understand.  I think

16  anybody -- I mean, my parents were relatively poor and they

17  finished high school but never got to go to college, and

18  their whole goal in life was to care for their children and

19  to make sure that they had opportunities.

20         And I was afraid of my parents, especially my

21  mother, who was I think sometimes too hard on me, but it was

22  always because she wanted to make sure that I had more than

23  she had and my dad had.

24         Your parents strike me as exactly the same people,

25  and the fact that you were brought up in a faith tradition,

1   which I respect a lot, makes me wonder why are you a
2   prosecutor and why is your brother a seriously evil
3   criminal.

4            And it just doesn't make sense with the background
5   that you have described --

6            MS. KARLA VALDEZ:  Your Honor --

7            THE COURT:  -- that anybody would engage in --
8   I mean, I can understand people cheating, and we have people
9   that steal money from people or cheat them out of money and,
10  you know, occasionally we have smaller drug transactions.
11  But this?

12           And you know, because you are from Texas, and it's
13  the southwest border that all of these drugs come across,
14  and you know how detrimental it is to our communities and to
15  even our democracy.

16           How could this have happened in your family?

17           MS. KARLA VALDEZ:  Your Honor, that's a question
18  that we ask each other every day.  I mean, people back home
19  look at us and they still don't believe it.  We all live,
20  Your Honor, in a surreal reality, and we turn on the news and
21  we see our brother, and we don't believe it.

22           And I know Your Honor mentioned, you know, how is
23  he so evil.  Your Honor, I think it's very simple to believe
24  everything that we read, everything that we hear, without
25  actually knowing that person.  It's so easy for us to judge.

1    He's not an evil person, he does not have an evil
2  heart, and I think it's safe to say that from all of us
3  present here, from all his family, I think he's the one with
4  the kindest heart.  If that makes any sense to you?

5    Why am I a prosecutor, why I went to law school?
6  Because I thought that one day I could help my brother out.

7    But there is just no way.  I could never amount --
8  or be able to live with representing him and having to live
9  with the outcome.

10    THE COURT:  He did this for a long time.  Were you
11  ever aware?

12    MS. KARLA VALDEZ:  No.

13    THE COURT:  Because I think you are shocked by the
14  scope and severity of his criminal conduct.  Did he hide that
15  from you?

16    MS. KARLA VALDEZ:  Yes, Judge.

17    THE COURT:  And was he good --

18    MS. KARLA VALDEZ:  He hid it from everybody.

19    There were tough times in our family.  My parents
20  before I was born -- you know, we had eight children -- my
21  father had to hold two jobs.  Eventually they opened up a
22  small store in downtown Laredo, a novelty shop.

23    And because it's a border town, there was a
24  huge devaluation of the peso down there, and so many
25  people wouldn't come over to cross the border to the U.S. to

1   shop, and so my parents had to present themselves in

2   bankruptcy. I remember having a conversation with him once

3   and him saying that it kind of all started stemming from

4   that.

5           My parents were having a tough time and, you know,

6   on the weekends would have to go to the flea markets, and we

7   actually all came along with them to help sell everything

8   that wasn't able to be sold at the store when it closed

9   down. Same thing, my brother -- I'm sorry, my father would

10  take him and all of us to go and help.

11          I remember having a conversation with him and him

12  saying that it just -- it became easy initially. It was just

13  easy, it was easy money. And he was trying to help out the

14  family just because of the tough times that my parents were

15  going through.

16          And I think it just snowballed from there,

17  Your Honor. I think it was just one thing after another and

18  after another. And when he wanted to get out, I don't think

19  he could.

20          THE COURT: Well, two other things occur to me.

21  You are more familiar with the law enforcement policy, but

22  I try to ask myself what would it have been like to have been

23  him, and there are two things that strike me.

24          That there were times when he was on a telephone or

25  in a conversation with somebody, and there is talk about tons

1    of cocaine -- or hundreds of kilos of cocaine that they were
2    procuring for transportation into the United States, he and
3    the other people that he was dealing with.  And we both know
4    that there were lots of those conversations, because the
5    scope of his activity would have required lots of
6    conversations and contacts.

7           Every time that he had one of those conversations,
8    it's hard to believe that he didn't know exactly what he was
9    doing.  So when he says that it was easy money, it's more
10   than that.

11          MS. KARLA VALDEZ:  I think initially.  And
12   obviously I'm not aware of what's in the court record,
13   Judge.  I think initially that's what he meant.  Initially
14   going in, wrong crowds, hanging out with the wrong crowds
15   perhaps, that became easy money initially.

16          THE COURT:  But --

17          MS. KARLA VALDEZ:  Conversations that perhaps you
18   are referring to, I'm not sure at what level those were
19   made.  If in fact, you know, he was on the other end of that
20   call, for example, that you are referring to, I'm not sure at
21   what level in his life or in business he was in.

22          And so when I -- in going back to the conversation
23   that I had with him, you know, why he got into all this,
24   initially it was just easy money.

25          THE COURT:  Easy money.

1    MS. KARLA VALDEZ:  So I'm not saying later down the

2    road he didn't know what he was doing.  I mean, he did plead

3    guilty and he understands what he did, Your Honor, and he

4    acknowledges what he did and he knows that what he did was

5    wrong.  And he's apologized to us and to my parents numerous

6    times for having put us through this.

7    THE COURT:  Well, first of all, none of your family

8    is responsible for what he did.

9    MS. KARLA VALDEZ:  I know.

10   THE COURT:  And if anything, I would say that I am

11   grateful that he didn't try to, as in other cases I have had,

12   try to draw family members into the business.

13   And I'm assuming for the purposes of today that he

14   didn't do that.

15   MS. KARLA VALDEZ:  He did not, Your Honor.

16   THE COURT:  And you have an intact family that

17   loves and supports each other, and that is something that

18   will allow you to get through anything, including this.

19   Here is the other thing.  Do you have children?

20   MS. KARLA VALDEZ:  I have one son.

21   THE COURT:  And how old is he?

22   MS. KARLA VALDEZ:  He's ten months.  He's asleep

23   right now.

24   THE COURT:  Yeah, I saw him.  No, I think he's

25   actually gone outside now.

1          MS. KARLA VALDEZ:  Oh.  Yeah, he has.

2          THE COURT:  Here is what I don't -- I'm a dad,

3   I have got two sons, and I now have four grandchildren.

4   I can't imagine what it would be like to know that you have

5   just done a huge cocaine deal and walked through the door of

6   your house and be in the presence of your children and your

7   spouse knowing what you have just done.

8          Nobody, no father would do that, no husband would

9   do that, unless whatever he was doing was more important to

10  him than they were.

11         I'm glad that he's I guess isolated that conduct

12  from his family, but I have a hard time sometimes when I have

13  done something wrong walking in, especially when I was

14  younger and my kids were at home, walking into the presence

15  of my children and known that I had done something that would

16  have disappointed him.

17         He's done something that could have gotten them

18  in -- could result in this, which is separation from them.

19  And why doesn't the love of a family say:  I just can't do

20  this anymore.  I can't do this to them.  I can't do that to

21  you.  I can't do that to my folks.

22         So there is something that motivates, a powerful

23  motivation, that caused him to ignore what he would and is

24  putting you through, what he would and is putting his

25  children through, that was much more powerful than all of the

1    good values that you have been taught that has brought you to

2    the job that you have and all the values taught to your

3    siblings and now the values that you will pass along to your

4    children.

5        And all of that goes into my calculation of how

6    could somebody have engaged -- and maybe I agree with you,

7    calling him evil is wrong, because in the sight of God we are

8    all forgiven what we have done, but we are responsible for

9    our conduct.

10       And the conduct that he -- it was the conduct he

11   engaged in that had evil results, and that is why we are here

12   today is to hold him accountable for that.

13       From one lawyer to another in the same law

14   enforcement environment, I want to thank you a lot for coming

15   here and speaking today.  I know how hard it is.  You have

16   given me some perspective that's important.

17       And to you and all the members of your family

18   I hope God protects you, I hope that you will continue to

19   look to Him as far as your strength and whatever redemption

20   and forgiveness you need to extend, and if there is any

21   bright spot in all of this day, it is you and your family.

22       Thank you for speaking.

23       MS. KARLA VALDEZ:  I appreciate it.

24       If I may just say one last thing?

25       THE COURT:  Of course.

1              MS. KARLA VALDEZ:  Your Honor, he felt trapped.

2         And I know it's hard coming back home to your

3    family after what you just mentioned, a deal, for example.

4    He was damned if he didn't, he was damned if he did,

5    Your Honor.  If he got out, he could have gotten killed,

6    gotten his family killed.  He just kept going.

7              He's regretful, Judge.  And I know it's not up to

8    me to say that he won't do it again, but he has told us that

9    this is behind him, that he definitely did stray as I

10   mentioned earlier, and that he wants his testimony to go on

11   and just to impact somebody positively, Judge.  And we

12   feel -- we all do believe that he will go on and do that.

13             I thank you for your time, Your Honor.

14             THE COURT:  Thank you very much.

15             MR. PARKER:  Your Honor, Mr. Abel Valdez, the

16   defendant's brother, would like to speak to the Court.

17             THE COURT:  Thank you.

18             MR. ABEL VALDEZ:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. ABEL VALDEZ:  My name is Abel Valdez.  I'm the

21   oldest of the Valdez family.

22             In Laredo I was a probation officer for four

23   years.  I was a sheriff deputy as well.

24             Going back to your question why, how with all these

25   values he took the wrong path, it's because he was young and

1    dumb.  I know that now he regrets everything he has done.

2    I'm not here to tell you -- Judge, he needs to be

3    punished.  I'm not here to tell you or ask you to let him go

4    right now.  He needs to get punished.

5    I just want you to give him enough time so he can

6    spend time with his kids, my mom and my dad.

7    And in jail -- on the outside they used to call him

8    Barbie.  In prison they call him the Christian Boy.  That's

9    his nickname right now.  And I'd just ask that you see that

10   in him.

11   THE COURT:  You know, we all have an impact

12   wherever we are placed.  Paul and John had their greatest

13   impact when they were in prison.

14   You know, the character of your family, just from

15   the two of you that have spoken, it reinforces in me what

16   good values your parents extended to you.

17   It is also really interesting that those values

18   took you and your sister into law enforcement, and here we

19   have, I mean, literally twenty feet from you somebody who

20   chose not just a different life, but a terrible and different

21   life.

22   While you were serving and when your sister serves

23   in her responsibilities, you are helping people, you are

24   holding people accountable for what they do, you are

25   protecting the community.

1         If we really drilled down to what happens when

2    somebody brings a quantity of substances that are illegal

3    into the United States and we look at the ultimate human

4    impact that it has -- which sometimes in an environment

5    like this we are just looking at what did he do and what are

6    the good things about him.

7         But for a long time I have been involved in this

8    program up at Kennesaw State University with kids, young

9    adults, that have basically had ruinous academic performance

10   because of drug addiction.  Very little alcohol, most all

11   drug addiction.  Some methamphetamine, a fair amount of

12   cocaine and marijuana.  And this program allows them to come

13   back to school in a peer-supported environment where kids

14   there in recovery support each other.

15        But I have in my office a video where we tried to

16   explain what these kids have gone through and how they have

17   redeemed themselves, and most -- all of them graduate and

18   they go on to get advanced degrees.

19        But to listen, there is one in particular, there is

20   a young girl who was using drugs, and tells the story about

21   having just this utter sense of hopelessness in the midst of

22   her addiction, and going into her garage at her parents'

23   home, rolling the garage door down and starting her car,

24   because she just could not live any longer.  And for some

25   reason somebody opened the garage door.

1        And she said at that moment she realized that she

2   had two options:  Death, or to turn her life around.  And

3   it's taken her a remarkable period of time to do that, but

4   she has.

5        That is somebody who is on this video because she

6   survived.  What's not on the video are the people who

7   didn't.  And that's the end result when you pour the kind

8   of drugs that your brother and those that he was working

9   with and coordinating with, that's the human toll that's

10  taken.

11       There are families that are not here that could

12  come in and say as the result -- if we could trace the

13  cocaine back, that would say my son at 15 years old was

14  killed because of his involvement in drugs.

15       You know that, and I know that, and the government

16  of the United States and its Congress knows that.  That's

17  why the guidelines for drugs is pretty tough.  The guidelines

18  for people that are at the level of your brother are very

19  tough.

20       And, frankly, in the time that I have been here and

21  looking at all the cases that my colleagues hear, the level

22  of your brother eclipses everybody else.

23       That's why this is a tough day for you, for your

24  family, and it will be a tough day for your brother.

25  Because there is a very real human toll, there is a very

1    real financial toll on communities, and there is a very real

2    toll on the fabric of communities.

3           And all you have to do is read what's going on

4    with prescription drugs and opioids in West Virginia,

5    where that state is literally -- parts of it are being torn

6    apart because somebody has seen fit to bring it into those

7    communities where there are people that are addicted and the

8    sales are robust, and we can see just in what's being

9    reported in the print media how it's ruining lives and

10   ruining cultures.  And I know you know all of that.

11          But I don't want you to think that I'm

12   unsympathetic of the human toll that will be taken on your

13   brother.  I already know the toll that's been taken on your

14   brother.

15          And sometimes I say these things because in my

16   mind I'm thinking what am I going to do, because I don't

17   know yet.

18          MR. ABEL VALDEZ:  Thank you.

19          THE COURT:  But thank you for coming.

20          MR. ABEL VALDEZ:  Thank you.

21          MR. PARKER:  Your Honor, am I correct -- we have no

22   further presentation on behalf of the defendant.  Do I wait

23   until after the government takes its --

24          THE COURT:  No, you should start, and then I will

25   hear from the government, and then you can respond to what

1  the government has said, so I will have your full view and
2  give you a chance to respond as well as present.  And then I
3  will hear from your client.

4          MR. PARKER:  So the responses -- Your Honor, given
5  the Court's previous ruling of 360 to life, the responses to
6  the argument for 360, which is thirty years, arguing for
7  thirty years, he's a defendant who is 44 years of age.  As
8  the Court notes, he will receive hopefully, it's up to him,
9  good time calculation of about 15 percent.

10          Now, we do have the issue of the incarceration in
11  the Mexican jail which we have all agreed is 61 months from
12  sometime in 2010 until his extradition, which I believe was
13  in September of 2015.

14          Clearly once he came into custody of the U.S. --
15  I guess technically the U.S. Marshal's Service when he
16  arrived on extradition, that time that he has been held in
17  custody traditionally would be credited to the time the Court
18  imposes.

19          But as we previously discussed with the Court,
20  I believe the government has taken a position, which we
21  appreciate, that he should be given credit for the Mexican
22  incarceration period, and that we previously discussed with
23  the Court this morning possibly the Court, if accepting the
24  government's and our joint recommendation, that the Court
25  makes some mention of that in the imposition of its sentence.

1    So that is the position right now on behalf of
2    defendant Edgar Valdez.

3        Thank you.

4        THE COURT:   Thank you.

5        Government?

6        MS. HATHAWAY:   Thank you, Your Honor.

7        The guidelines call for a sentence of 360 months to
8    life.   And if there was ever a drug trafficker who deserved
9    more than the guideline minimum, it is the defendant
10   Mr. Valdez.

11       Going through the 3553 (a) factors that I know the
12   Court will consider, I don't know if I could say anything
13   more or better than what the government already set out in
14   our sentencing memorandum about the nature and the
15   circumstances of this offense and how serious it is.

16       Sitting here today is one of the highest-level
17   drug-traffickers ever seen in this district, as the Court
18   just pointed out, a man who is conservatively being held
19   accountable for 12,000 kilos of cocaine.   The level 38 of the
20   guidelines is 450 kilos or more.   He's being held accountable
21   for 12,000 kilos.

22       He's a man who over a twenty-year period grows from
23   being a high school football star in Texas to becoming the
24   only American citizen to reach a leadership position in some
25   of Mexico's most infamous drug cartels.

1    As we discuss in our memo and as the Court
2   pointed out today, it didn't have to be that way.  The
3   defendant is not someone who grew up in Mexico in the shadow
4   of the cartels.  He is a United States citizen.  He was a
5   football star.  And from everything I have read and
6   everything I have seen here today from Mr. Valdez's siblings,
7   that he comes from a respectable and respected family in
8   Laredo, Texas.

9    Yet he decided to leave that life behind and chose
10   instead the life of the underworld, building at first his own
11   organization where by age 28 he was already responsible for
12   shipping hundreds of kilograms of cocaine into the
13   United States.

14    And from there, he methodically and ruthlessly
15   worked his way up to becoming a close associate of and a
16   top enforcer for Arturo Beltran-Leyva, both when Beltran
17   was a high-level member of the Sinaloa cartel and when
18   the Beltran-Leyva brothers broke off to form their own
19   cartel.

20    And as you saw from our sentencing memo, the path
21   that the defendant chose to reach those heights is littered
22   with violence, corruption and greed.

23    You read about how Mr. Valdez would buy off members
24   of the Mexican police, using official police vehicles to
25   escort customers to him, bribing officials to allow him

to hide his minions within police ranks, paying off state
and local law enforcement to act as his bodyguard and
intervene if he was ever stopped, and obtaining government
uniforms that he and his workers could wear to give the
impression not only that he was above the law, but that he
was the law.

And that was Mr. Valdez's nonviolent side.  He also
had a brutal side.

Defendant and his organization arranged the
shipments of all kinds of weapons for him to use in his
defense, and he wasn't afraid to use them.

After losing control of the Laredo corridor,
Mr. Valdez sought the support of top cartel leaders to go
to war with the Zetas to win it back.  With Arturo
Beltran-Leyva's support, he won that approval, and
together with three hundred of his men, he started an
all-out war to push the Zetas out of Nuevo Laredo and back
into Reynosa, a war which left an unknown number of people
dead or missing.

Indeed over the course of Mr. Valdez's criminal
career, we don't know how many people died at his hands,
whether by his pull of the trigger or at his command,
but I would submit to the Court that any death is one too
many.

And we know all too well about at least one of

those deaths.  We know because defendant chose to videotape an interrogation he and members of his security team had with a Zeta member who had been sent to assassinate him.

And in our sentencing memo, we gave the Court the link to the ABC news clip that shows you the end of that interrogation.  The barrel of the gun is placed to the head of the would-be assassin and the shot is fired at point blank range.

Now, to be fair, Your Honor, we don't know who actually pulled the trigger, and the evidence suggests it was not Mr. Valdez himself, but there is little doubt who gave the orders to commit that murder or who approved the firing of that gun.

And we know all about this murder because what is so unique about Mr. Valdez is that, unlike most drug-traffickers who choose to hide their dirty business in the shadows, Mr. Valdez relished in the limelight, even and maybe especially when it comes to his violent acts.

Having videotaped that execution, defendant and co-defendant Carlos Montemayor had multiple copies of that video made and sent to media outlets throughout Mexico and the United States.  He even -- Mr. Valdez even wanted that video sent to U.S. law enforcement.  He wanted the world to know that you don't mess with Edgar Valdez.  He was in control.

1    And his efforts at letting the world know about him
2    was a success.  That video went viral over the internet.

3    Meanwhile, Mr. Valdez's cocaine business thrived.
4    Defendant cultivated his own source of cocaine in Colombia,
5    bringing in literally tons and tons of cocaine into Mexico by
6    speedboat and submarine and airplanes, and then shipping
7    kilogram after kilogram of that poison into the
8    United States, including here into Atlanta.

9    And Your Honor got to hear first-hand how
10   defendant's operation worked when one of his top U.S. cell
11   heads, Hector Flores, went to trial in January of 2008.  You
12   heard how this organization operated with military-like
13   precision.

14   And you heard how here in Atlanta in July of 2005
15   this organization stored 215 kilos of cocaine in a house, and
16   how one month later a truck was stopped leaving Atlanta with
17   about 2.5 million dollars' worth of cocaine proceeds, and
18   then in November when the case was taken down how agents
19   found another 120 kilos of cocaine and another 1.5 million
20   dollars.

21   In fact, you heard how this organization
22   distributed about fifteen hundred kilos of cocaine in just
23   six months in Atlanta alone, drugs that were poisoning our
24   community and communities like ours along the eastern
25   seaboard.

1           And I will remind the Court that after hearing the
2    evidence in that case, you described this organization as the
3    most efficient, ruthless drug organization you had ever
4    seen.

5           And yet that was the tip of the iceberg.   That
6    didn't account for defendant's actions in Mexico, didn't
7    account for his ruthless acts of violence, nor did it account
8    for his continued distribution of cocaine.

9           Because even as the case here in Atlanta was being
10   taken down and numerous people like Hector Flores were
11   arrested, defendant continued to flood the United States with
12   cocaine, bringing in approximately six hundred kilos every
13   two to three weeks.

14          Simply put, the horrendous nature and
15   circumstances of this offense cannot be understated.
16   The requirement for your sentence to provide a just
17   punishment and promote respect for the law could not be
18   higher, and the need to protect the public from further
19   crimes of this defendant could not be greater, for there
20   can be no doubt that our community, that this country and
21   the country of Mexico are safer places with Mr. Valdez
22   behind bars.

23          Finally, Your Honor, I wanted to address the need
24   for deterrence, because I think that's especially great
25   here.

1          As I mentioned, Mr. Valdez did not hide in the

2    shadows.  He was the very public face for all that is the

3    worst in drug-trafficking organizations, and yet his image

4    has reached almost mythic proportions.  With his flashy cars

5    and fancy houses, he has been hailed in the media as the

6    American drug Lord or the modern mobster.

7          And when I think of deterrence, I think of two

8    specific things, Your Honor.

9          First, I want to refer the Court back to that ABC

10   news video clip which we cited to in our memo.  There were

11   many things that were chilling in that video clip, including

12   the Zeta murdered, but I think one of the most alarming

13   things was the scene in which the high school kids in Laredo

14   idolized Mr. Valdez as the guy who had the money and the

15   women and the houses.

16         The sentence that you impose today needs to tell

17   those kids and kids like them that that is not the end of

18   the story.  Edgar Valdez does not live out his life as

19   Midas in a mansion.  This right here, this is the end of

20   Mr. Valdez's story.  Decades in federal prison is where one

21   could expect to end up if they follow the path that he

22   chose.

23         '        The other reason why I think deterrence is so

24   important here is because Mr. Valdez's public image is a

25   basis for sending a message to all other high-level

1    traffickers who operate outside the United States.  We will
2    still charge you.  We will find you, and we will bring you to
3    justice.

4         And so for all of those reasons, Your Honor,
5    I think a significant term of imprisonment would be warranted
6    in this case.

7         Now, the government is not asking for a lifetime
8    term of imprisonment.  That is the high end of the
9    guidelines, but we are not asking for that, because there are
10   still mitigating factors.  All of the factors that we
11   discussed earlier regarding the 5K, everything that
12   Mr. Valdez has done since he has come to the United States,
13   and I would mention his guilty plea within about three months
14   of his arrival in the United States.

15        Now, I have been before the Court enough to know
16   how the Court feels about acceptance of responsibility beyond
17   the three levels that are accounted for in the guidelines,
18   and I respect that.  But I would submit to the Court that an
19   early plea and agreement to cooperation in this case is
20   extraordinary.

21        The evidence in this case is voluminous, complex,
22   and, frankly, somewhat dated, and Mr. Valdez was not
23   intercepted on the wiretaps.  Instead the case was built
24   against him mainly on the testimony of cooperating witnesses
25   who would have to come in to testify, and their testimony

1    would have to be corroborated.

2          While the government would have been happy to bring
3    this case to trial, we can't escape the reality of the cost
4    that doing so would entail not only in preparation time but
5    ensuring the safety of those cooperating defendants who would
6    be exposed to security risks once their cooperation became
7    known.

8          Instead, Mr. Valdez came in and immediately took
9    responsibility for his conduct knowing that he was surely
10   facing a life sentence.  Mr. Valdez fully admitted his
11   guilt, and has not wavered.  He didn't file any pretrial
12   motions, nor did he object to the Sentencing Guidelines,
13   which by enhancement took him from a base offense level of
14   38 to a total offense level of 54 and then 51 with
15   acceptance.

16         So I think if the Court were to sentence Mr. Valdez
17   to a lifetime or what is the equivalent of a lifetime term of
18   imprisonment, it would send a message to other high-level
19   traffickers that there is no benefit to pleading early and no
20   benefit to cooperating.

21         If the sentence is going to be the same whether
22   it's at arraignment or after conviction, I think it would
23   send an opposite message, that a lifetime -- that one might
24   as well out all the cooperators and make it as difficult as
25   possible for the government and the courts.

1        And so with that, Your Honor, I would ask the Court

2   to sentence Mr. Valdez to something that falls shy of a life

3   sentence.  The government is recommending a sentence of 660

4   months, which is 55 years, on all counts of both indictments,

5   except for Count Nine of the Atlanta indictment because the

6   statutory maximum is 240 on that count.

7        And to explain how we got to the 660-month

8   recommendation, there are many factors we considered.

9   All of the 3553 (a) factors that I just mentioned.

10       We also considered the need to avoid unwanted

11  sentencing disparities both within this case and in

12  general.  Within this case -- and I know that parity is

13  important to the Court -- we did look at the sentence of

14  Hector Flores, the U.S. cell head.  The Court sentenced him

15  to 460 months.

16       Now, there are several differences between the

17  defendant and Mr. Flores, but given the culpability

18  difference between the two, a sentence less than that would

19  be unwarranted.

20       Also the government is very aware that the sentence

21  the Court imposes today is going to be the benchmark for all

22  sentencing of all future drug defendants both here and

23  possibly in other places in the foreseeable future.

24       It's not uncommon for drug defendants here who are

25  not nearly as prolific or as violent as Mr. Valdez to be

1   facing sentences of 25 to 30 years or even in the 360-month
2   range.  And so I think the sentence today does need to
3   reflect that it is going to be the benchmark, that everyone
4   else in the future is going to say:  I'm not as bad as
5   Mr. Valdez.  He got X, I should get something less than
6   that.

7           So the government believes that a sentence of 660
8   months strikes a fair balance between all of the aggravating
9   and all of the mitigating factors, and it's a sentence, as
10  I said, that is just shy of life, but it does give Mr. Valdez
11  the opportunity, the possibility that one day he may walk
12  away a free man, while at the same time it ensures the public
13  if he does so, it will be at a time when he is no longer able
14  to inflict the kind of harm he has done.

15          Now, even though Mr. Valdez is currently 44 years
16  old, a 55-year sentence will not necessarily mean that he
17  will stay in custody until he's almost a hundred.

18          We talked about the time credit that Mr. Valdez, to
19  my knowledge, has been earning, and I expect that he wouldn't
20  do anything to jeopardize that in the future, and should he
21  get good time credit under the government's recommendation,
22  he could reduce his sentence by 99 months.

23          In addition, as we have all discussed already, the
24  government would be recommending to the Court that he get
25  credit for the time he served in Mexico.  That's based on the

1   fact that the conduct, even if it's on Mexican charges,
2   I believe that the conduct that he was being arrested for was
3   part of this offense or relevant conduct.

4   I know Mr. Parker mentioned that the conditions of
5   confinement in Mexico were horrific.  I will note for the
6   Court that at least in the beginning of Mr. Valdez's
7   incarceration it was not.

8   In the letters that Your Honor had received from
9   the defense, there is a letter from November of 2010 from
10  Mr. Valdez's attorney at the time asking authorities in
11  Mexico to keep Mr. Valdez where he was in custody at that
12  point because he -- and I'm quoting -- is well-guarded --
13  excuse me -- he is well-guarded, and for two and a half
14  months he's been treated humanely and his safety is
15  assured.

16  Now, I know he was moved from that facility, I
17  don't know when, but I will say, Your Honor, the blanket
18  statement that the conditions were horrific in Mexico I don't
19  think is correct.

20  So, Your Honor, with good time credit, a sentence
21  of 660 months would result or should result in an actual
22  sentence of 561 months, or almost 46 and a half years.  And
23  if that date were to run from the date Mr. Valdez was
24  arrested in Mexico -- that would be in August of 2010 -- he
25  was 37 years old at the time, and it would give him the

1    opportunity to walk out of custody when he's 84.

2             Finally, Your Honor, justice would not be served if

3    the defendant were able to keep all of the profits from his

4    drug-trafficking.  The government did file a preliminary

5    order of forfeiture asking the Court to impose a money

6    judgment of $192,000,000.  That is an extremely conservative

7    estimate, but an estimate of the profits defendant earned

8    over his twenty years of drug-trafficking, and that's based

9    on an estimate of twelve thousand kilos of cocaine sold for a

10   conservative average of sixteen thousand per kilo.

11            So in summary, Your Honor, for all of those

12   reasons, the government recommends that the Court

13   incarcerate -- or sentence Mr. Valdez for a term of

14   incarceration of 660 months to run from the time that he was

15   first arrested in August 2010, and also to sign an order of

16   forfeiture in the amount of $192,000,000.

17            Thank you.

18            THE COURT:  Mr. Parker, do you have anything you

19   want to respond to, including the judgment and forfeiture

20   that has been mentioned by the government?

21            MR. PARKER:  We take no position on the

22   government's motion of money judgment, Your Honor.  I accept

23   the calculation as the government has articulated as a

24   logical calculation, and clearly there is evidence in the

25   record to support a money judgment.

1          THE COURT:  Would Mr. Valdez like to speak?

2          MR. PARKER:  He would, Your Honor.  Would you care

3   for him to remain at the table or --

4          THE COURT:  Wherever he's most comfortable.

5          Do you need the interpreter or do you want to speak

6   in English?

7          DEFENDANT VALDEZ-VILLAREAL:  Good morning,

8   Your Honor.

9          THE COURT:  Good morning.

10          DEFENDANT VALDEZ-VILLAREAL:  First, before my

11   letter, about what I was hearing I didn't walk over just to

12   turn myself in, it was my interest to turn myself in, and the

13   government has proof of that, because we sent letters proving

14   that, and they just told me to wait.  And we got proof of

15   that.

16          I mean, that is no excuse, what I'm saying, but I'm

17   just saying what the government was saying, that myself,

18   I was going to turn myself in, and there is a letter from the

19   government saying hold off and keep on doing what you got to

20   do.

21          That they want to send a message to the people in

22   the Mexican cartel and all that, I mean, that's true, and

23   they can also send a message that the government is willing

24   to cooperate, so they can stop all this, the drugs and

25   killings there in Mexico.

1     I'm pretty sure there is a lot -- if they are

2   seeing that they could get a life sentence if they cooperate

3   and turn themselves in and stop what they are doing, killing

4   and all that, I know it will be a message we can send to them

5   that, you know, if it can happen to me, it can happen to

6   anybody.

7          On the case, I don't want to say we are not

8   agreeing with all the things they said, because I know

9   I accept my responsibility, but it's not all true what they

10   say in the PSR and my case.

11          About Flores and all that, I mean, it was their

12   things.  But, you know, I know I did myself other things, but

13   it's not what they are saying.  Six hundred kilos a week and

14   all that, it's not true.

15          John Horn when I talked to him, he told me in

16   front of them, you know, I know he was stymied.  There is a

17   lot of guys that have been saying -- I'm not saying that I'm

18   not guilty, I accept my responsibility, but not everything

19   they are saying.  But I know I have got to accept

20   responsibility.

21          And on the guideline, I'm not trying to tell you

22   what you have got to do, but there is a guideline that

23   starts only at 53 on the scale, I mean, the original one.

24   I mean, they got me at 51.  I would like for them to start at

25   43, and for my responsibility to lower it three points and

1    end up at 40.  From there, take into consideration my

2    cooperation.

3            I have got to say, I mean, I am saying I am being

4    truthful here from my heart, there is a lot of people being

5    killed, and like I say, I'm not saying that -- I accept my

6    responsibility, but me in my 44 years, I have never killed no

7    one.  There are lot of people getting killed, but me, myself,

8    I never killed no one.

9            Those twelve thousand kilos they are saying,

10   I mean, yeah, maybe Arturo, the cartel, moved them, but they

11   got me too there, so I'm not saying I didn't move those, but

12   the cartel moved them.  But I accept my responsibility for

13   some other things.

14           The submarines and what they say, I didn't do

15   that.  But I'm not saying -- I accept my responsibility

16   because I was doing wrong, but not on that.

17           And, Your Honor, I give you thanks for allowing me

18   to speak today.

19           First of all, I want to accept -- sorry.

20           First of all, I want to say I'm sorry and apologize

21   and ask for forgiveness for the pain and suffering to all the

22   community I caused because of my actions.

23           To my parents and my family -- my parents and my

24   family for the shame -- I embarrassed them -- that I have

25   brought to them, and I put them and their lives in danger.

1        I want to say to my family that I love them very

2    much and I thank them for staying with me through this.  My

3    parents, basically right -- they worked very hard to give

4    me -- to us the opportunity to be successful in life.  My

5    parents taught me right from wrong, told me to stay away from

6    bad people and drugs.  Instead of me doing that, and -- I'm

7    sorry.

8        Instead of me doing something good with the

9    honest -- with the values my parents showed me, instead of

10   good, I went the other way and did wrong.

11       My mom and my dad I want to thank for loving me and

12   doing the best you could to raise me right.  I am sorry, mom

13   and dad, for doing things that -- I'm sorry, dad and mom, for

14   doing things that are against and hate -- let me start

15   again.  I'm kind of nervous.

16       I'm sorry, mom and dad, for doing things that you

17   are against and hate, for the shame and disappointment

18   I caused you.  Please forgive me.

19       Several years ago while I was incarcerated, I gave

20   my life to God, Yahweh, the Almighty.  I'm not the same

21   person that I was before.  The things that I hate doing in my

22   life -- the things that I have done in my life now I am

23   against.

24       I accept Jesus Christ as my savior, and God has

25   changed my life, because I was blind.  I thought I was doing

1  good, helping people, donated money, donated drug money.

2       It has taken this process and me coming to prison

3  to see what drugs has done to the world.  There is nothing

4  that I can say or do that can change the past, but the person

5  I am today can make a difference in the future.

6       In prison I'm a person that organized and have a

7  daily prayer group.  I started with one person, one inmate

8  and myself.  Now it has grown to thirty or forty other guys a

9  day.  Dozens of inmates have attended over the years.

10      I am living my life as an example.  I have clear

11 conduct for the eight years that I have been incarcerated in

12 prison.  I talk about my life and use that as an example to

13 others, and I mentor others and show them that a life in

14 drugs will lead you to prison or death.

15      If given a chance, I want to mentor kids and young

16 adults about the consequence of drugs.  I do not want to even

17 see anyone else make the mistakes that I have made.  Now this

18 is in my heart.

19      In the Bible, Luke Chapter 15, my life is a lot

20 like the parable of the lost son.  The son said to his

21 father:  I have sinned against heaven and against you.  I am

22 no longer worthy to be called your son.

23      The father then said:  For this son of mine was

24 dead, and now he is alive again.  He was lost once, and now

25 he is found.

1    Today, Your Honor, I stand here in front of you and
2    accept full responsibility for my actions.  I have assisted
3    and fully cooperated with the government, with the
4    United States government.  I have done everything that was
5    asked of me, and I have done what was in my power.

6    My family never had anything to do with my
7    conspiracy or organization.  Due to my cooperation with the
8    United States government, my family's lives and my life is in
9    danger.  We will be in danger for the rest of our lives.  If
10   I am in prison or not, I will always be a target because of
11   my cooperation.

12   Because of my cooperation, my friends and the
13   people I grew up with and have known my whole life consider
14   me as a traitor and now think the worst of me.  I know in my
15   heart that I have done the right thing, and I know that God
16   has spared my life for bigger reasons.

17   Your Honor, I have cooperated, and I am going to
18   keep on doing so.  I am not a bad person.  I am a good person
19   who has made bad decisions in his life.

20   I am a son, a brother, and I am a father myself.
21   I am not lost.  I am someone who can and will be a pillar of
22   the community.

23   My life is in your hands, Your Honor.  Today I want
24   to ask -- no, not ask -- beg in the name of Jesus to have
25   mercy on me and for my family.

1            Thank you, Your Honor.

2            THE COURT:   Thank you, Mr. Valdez.

3            I'm going to take a five-minute break, and there is

4   something I want to do on my sentence that I want to make

5   sure I do it correctly, and then I will be back in five

6   minutes.

7            (A recess is taken at 11:54 a.m.)

8                        --   --   --

9            (In open court at 12:07 p.m.:)

10           THE COURT:   Let me take a moment, Mr. Valdez, to

11  collect my thoughts in view of what I've heard today and

12  what I've read in the PSR and particularly what you had to

13  say.

14           What you said and what your family members have

15  said and even the parable that you cited from Matthew is

16  all about relationships.

17           And I understand why you would like for me to

18  focus on the relationships.  Defendants often do that.  And

19  I think it's helpful for me to remember, which I do, that

20  everybody who sits where you are sitting and is sentenced by

21  me loses something.

22           And there are few people in the United States who

23  have the ability to deprive people of their freedom.  And

24  when you are talking about you and your family and what you

25  are being deprived of, it's often made most poignant as far

as me focusing on a sentence when you talk about your relationships, especially relationships with your immediate family and most importantly with your children.

But then I thought isn't there really more to this case than that, and what really did you do to your relationships with the people that I have mentioned, and have you done something to other relationships and responsibilities that you have.  And I thought what is the way to capture that.

And I can't remember ever using this word in the past, but you have betrayed almost everything that is important to anybody in this country.

You know, we are commanded to honor our fathers and our mothers.  You gave an apology to them, but you betrayed everything that they tried to do for you.

You betrayed the sacrifices that they made when they didn't have much to sacrifice.  You betrayed the trust that they had in you as they tried to raise you well.  You betrayed the two specific things that they told you not to do, which is not to get influenced by bad people and not to get involved in drugs.

Not only did you betray that in a small personal way, you betrayed that in the largest way that I have seen any defendant that ever appeared in this courtroom or any defendant that I ever investigated when I was in the

United States Attorney's Office.  You have distinguished
yourself as few among many.

You betrayed your sisters and your brother.
I thought about that and I said, you know, it's one thing if
siblings don't always get along well, but what I hear is that
you were a close-knit family that was cultivated by loving
parents, and you hid from them who you really were.

People who love each other don't hide who they are,
and you did that.  I'm not sure that you did it well, because
I believe that if I had a really candid conversation with
every member of your family, that they all knew something was
up.

How do you account for all the things that you
acquired?  What kind of job did you have that would have paid
you millions of dollars that would have allowed you to buy
nice things and nice cars, provide for your family?

And I know how my sister does it, because she's
a doctor and she works incredibly hard and she makes a
fair wage for what she does.  I know my other sister doesn't
do that because she doesn't have nearly the resources.
Family members know family members, and they know what's
up.

You betrayed especially the two people who spoke
here, who you knew were engaged in the very professions that
were supposed to stop people like you or to deal with you or

1   somebody who is apprehended and prosecuted for violating the
2   laws.

3           And how you could have ever been in their presence,
4   especially your sister, knowing what you were doing and said,
5   Let me, when I leave here, I have got to go make another
6   deal. You have lived a lie, and you deceived her, and that's
7   about as great a betrayal as I can imagine.

8           You betrayed your very children. What kind of
9   example have you set for them? When things get tough, when
10  the money is easy, what do you do? You just lie and cheat
11  and commit more crimes in a broader way.

12          You know, some day, I don't know when it will
13  occur, your younger children are going to say, Dad, why did
14  you do that to us? Why did you betray us? And why did you
15  do it over and over again? And what really was going through
16  your mind when you walked through the door of the place where
17  I live knowing what you had just done?

18          You betrayed your country. We try hard, we send
19  people into harm's way to go and investigate people like you
20  in undercover capacities, put themselves at great risk.

21          We have seen examples of that just in the last few
22  years where law enforcement officers, trying to protect the
23  country, trying to protect its people, have lost their lives
24  in the line of duty. We see that every day in American
25  communities.

1    One of the things they are doing is they are

2    investigating drug transactions, transactions which would

3    never have occurred if you had never done what you did.

4    And you have betrayed the communities that those

5    law enforcement people serve.  I have given you my one

6    example, but there are many more of what the scourge of drugs

7    does in not only ruining lives, but sometimes taking the

8    lives of people.

9    Have you ever sat in a room with a mother and a

10   father trying to deal with a son or a daughter who is

11   addicted and see the heartache and loneliness that occurs

12   between a parent and a child, sometimes between parents

13   themselves, because somebody can go down to a street corner

14   or go into a house and buy the very things that you so

15   willingly, freely brought into the country, or caused or

16   helped to bring into the country because it made you rich?

17   The scope of your conduct is really hard for me to

18   fully understand because it is so extensive.  There is no

19   doubt that it's egregious.  We know just from what we have

20   heard here today that it was dangerous.  And I bet there is

21   not a single person in this courtroom that doesn't believe

22   that what you have done is despicable.

23   And nobody is welcome in our communities who

24   chooses to engage in the arrogant, self-interested, greedy

25   conduct in which you engaged, which alone is one of the

1    reasons why you will be removed from it, because you haven't
2    earned the right to live in an American community.

3          You know, I know something about your organization
4    that you don't know, because you weren't here when Mr. Flores
5    was tried, but I was.  And I saw the manipulation, the
6    deceit, the storage of stash houses, saw the volumes in those
7    stash houses.

8          I saw the implements by which you took what you
9    made from the sales of illegal substances, how it was
10   wrapped, how it was sent, and how it was transported in traps
11   and drugs brought in in traps under cover loads.

12         I saw all of that, and now I get to see who was
13   responsible for allowing that to happen, and that's you.

14         Then you sat here in front of me, you said you
15   wanted to go to the podium, and having heard lots of
16   defendants speak to me, some in serious cases, some in less
17   serious cases, but all people that were trying to manage and
18   handle and internalize their crimes, and as I took notes
19   about what you said, almost every time you tried to explain
20   away why you shouldn't be held seriously accountable, because
21   you didn't really do what they said -- even though the PSR
22   was unobjected to -- that you really didn't do anything that
23   the government said, but there is no evidence that you
24   didn't.

25         You said that, you know, you are sorry for what you

1    did to your family, but with a kind of offhand glance over

2    your shoulder, as if you could throw that apology from the

3    rear of your head to your family.

4              And I think the words that you chose when we talked

5    about even people getting physically harmed or murdered,

6    I think those words were chosen carefully, because I think

7    today you are still trying your level best, as you were

8    doing your level best to sell, to arrange for the

9    transportation of illegal substances into this country and

10   its communities and to its adults and children who live here,

11   that you are very careful about what you say, and you are

12   very good at it.

13             I can tell -- even somebody who has been in

14   pretrial detention for a long time, I can tell when somebody

15   has such deep remorse that they can hardly stand and speak to

16   me.  There were a couple of times when you got choked up a

17   little, but most of what you said was -- you were reading

18   from what you had written, which is a good thing, but even

19   when you write, it's impossible for somebody who is really

20   remorseful not to use words of remorse.

21             You had more words that were an excuse than they

22   were of truly being sorry, not just to your family --

23   I believe you are sorry for them -- but in all of the time

24   that we spent -- and it was fairly long -- I think there was

25   only one mention of how sorry you were for the communities.

1         And we have these 3553 (a) factors which have two

2    basic components, and since you know the Bible well, there's

3    a -- and, in fact, I was reminded of this by a chaplain just

4    last week who said there is a verse in Micah that says that

5    all of us are responsible to do justice, love mercy, and walk

6    humbly with our God.

7         I think all of us are supposed to do the last

8    thing.  It's poignant for me that I have to do the first two,

9    and I do that in a sentencing.

10        The mercy part is the first part of the 3553 (a)

11   factors:  Who are you, why did you do what you did, what

12   external factors were there that caused you to do what you

13   did, how remorseful are you, what's your character, what are

14   the good things that you've done.

15        The only good thing you told us that you did other

16   than how much you care for your family is that you used drug

17   proceeds to make donations.

18        We don't encourage people to sell drugs to do

19   charitable works, and I will bet if you told those people the

20   origin of those funds, they would have said:  Not me, and not

21   now, because I abhor the generation of profits from the kind

22   of activity that rips apart our families and our

23   communities.

24        So I think I know a fair amount about you.

25   This is the third time that we have been together,

1   and there is a little bit that builds upon the character and
2   persona of a person each time I get to see them, and now
3   I have got some outside information from those that spoke on
4   your behalf.

5           So I fall upon the next part of the 3553 (a)
6   factors which is to do justice.  Justice is the
7   responsibility that I accepted when I became a member of our
8   court because I knew that there were days and cases like this
9   where my responsibility was, besides listening to what a
10  defendant did and why they did it, but also to protect the
11  interest of the people of the United States.

12          And so the last characteristics are:  Is the
13  punishment, does it reflect the seriousness of the offense,
14  is it fair, is it just, does it deter the person who is being
15  sentenced, does it deter others, does it provide services
16  that would be available to somebody if they are incarcerated
17  at the prison to which they are assigned.

18          Some of those services you've said yourself you
19  need, which is protection from other people, and that's
20  something that you will get.  Because the responsibility of
21  the Bureau of Prisons, besides holding you in custody, is to
22  ensure your safety, and you will benefit from that.

23          What you never considered is that there is no place
24  for us to send your family to protect them.

25          This is a really -- and I will tell you one more

thing. There is a communication that you said during the
course of trying to provide information and then talk to
government officials about the possibility that you could
turn yourself in as you were trying to negotiate and what you
might get in return, but there were two names on one of the
documents, the person in Louisiana and the person in the
Southern District of Texas with whom you communicated,
Mike Shelby and Jim Litton.

Mike Shelby and Jim Litton were two of the people
when the United States Department of Justice decided that the
real problem in our country and the real way that we could
impact them is to focus on transnational groups, and those
were the people that you were trying to communicate with as
they tried to protect the country against people just like
you.

And what you don't know is that it took law
enforcement a while to realize that you have to have
coordination from all law enforcement if you are going to
attack a problem as big as this shipment over the southwest
border of drugs to infect our communities, and today you are
here because of a change in strategy that targeted
organizations like yours for the purpose of stopping what
you do, stopping what others do, and to hold you accountable
for what you have done. And this is the day that that
happens.

1       I'm sorry that your selfishness inflicts this pain
2   and anguish on your family, but I suspect there are many
3   times during the course of your conduct that you knew that
4   this wasn't just about what might happen to you, it's about
5   what might happen to your family members, and in fact you
6   finally decided that it was bad enough that you had to start
7   finding a way to protect them because you knew that any day
8   somebody could have walked into their home and hurt them, not
9   because they didn't like them, but because they either wanted
10  the money that you were getting or wanted the territory that
11  you got or wanted the power and the prestige or wanted to
12  have this stardom that you had amongst the young people in
13  Laredo.

14      So I have decided upon a sentence.  It's a sentence
15  of 650 months, which I am going to reduce to give you credit
16  for the time that you were in Mexican custody, and I've
17  subtracted that from the 650 months so that anybody reading
18  this transcript would know that you have already gotten
19  credit for that.

20      Even though it's not a clear call that you should,
21  but that's one benefit because the government and your
22  lawyers have requested it and I have agreed to it, although
23  if they hadn't I'm not sure I would have given it to you.

24      But with that, if you will stand, I will announce
25  the sentence I intend to impose.

1                Under the Sentencing Reform Act of 1984, it's my

2  judgment, Mr. Valdez, that you be committed to the custody of

3  the Bureau of Prisons to be imprisoned for a term of 589

4  months as to Counts One and Two in Docket No. 09-CR-551, and

5  589 months as to Counts One and Two in Docket No. 16-CR-155,

6  and twenty years on Count Three in Docket No. 09-CR-551, with

7  all of those sentences to run concurrently with one another,

8  for a total period of incarceration of 589 months.

9                I'm further ordering that you pay the

10  United States a special assessment of $500, and that's

11  due immediately.

12                I'm further ordering that you shall pay the

13  United States a total fine of $100,000.

14                I'm ordering that you make forfeiture in the amount

15  of $192,000,000 in the form of a money judgment.

16                Upon your release from incarceration, you will be

17  placed on supervised release for ten years on Counts One and

18  Two in Docket No. 09-CR-551, ten years on Counts One and Two

19  in Docket No. 16-CR-155, and three years on Count Three in

20  Docket No. 09-CR-551, with all of those terms of supervision

21  to run concurrently with one another, for a total term of

22  supervised release of ten years.

23                And within 72 hours of your release from custody,

24  you will report in person to the probation office in the

25  district into which you are released.

1          While you are on supervised release, you shall not

2  commit another federal, state or local crime, and you will

3  comply with the standard conditions that we have adopted as a

4  court, and the following additional conditions.

5          You shall not unlawfully possess a controlled

6  substance.

7          You will submit to one drug urinalysis within

8  fifteen days after being placed on supervision and at least

9  two tests after that as your probation officer directs.

10         Under federal law that requires mandatory DNA

11  testing for federal offenders convicted of federal felony

12  offenses, you will cooperate in the collection of DNA as your

13  probation officer tells you.

14         You cannot own, possess or have under your control

15  any firearm, dangerous weapon or other destructive device.

16  Besides being a violation of supervised release, that's a

17  separate crime under the laws of the United States for which

18  you could be prosecuted and punished.

19         And you will submit to a search of your person any

20  property that you have at the request of your probation

21  officer.

22         Having carefully considered all of the information

23  presented to me during the course of these proceedings and

24  evaluated the factors under 3553 (a), I find that this is the

25  fair and reasonable sentence in this case, and it's the one

1    I intend to impose.

2              Is there any objection from the government?

3              MS. HATHAWAY:  No, Your Honor.

4              THE COURT:  Any objection from the defendant?

5              MR. PARKER:  No objection as to the form,

6    Your Honor.

7              THE COURT:  And I hereby impose the sentence I have

8    just announced.

9              And you may be seated.

10             Let me read your appellate rights.

11             Having pled guilty to the crimes in these two

12   indictments, you can appeal if you believe your guilty plea

13   was either unlawful or involuntary or there was some --

14   I need for him to listen to his appellate rights.

15             Are you ready to listen?

16             DEFENDANT VALDEZ-VILLAREAL:  Yes, sir.  I'm sorry,

17   Your Honor.

18             THE COURT:  Your appellate rights are you can

19   appeal if you believe your guilty plea was either unlawful or

20   involuntary or there was some fundamental defect in the

21   proceedings that was not waived by your plea, and you can

22   of course appeal your sentence.

23             If you decide to appeal, that begins with the

24   filing of a notice of appeal that your lawyers will help you

25   file.  It's a short statement of your intention to appeal.

1    If for some reason they are not available to you,
2    the Clerk of Court will assist you in filing your notice of
3    appeal.

4    While it's easy to prepare, it has to be filed of
5    record within fourteen days after the entry of the judgment
6    in this case, and that will happen in the next day or two.
7    It's once that becomes part of the record of your case that
8    the fourteen days begins to run.

9    And you you will stay in the custody of the
10   Marshals's Service until you receive your prison
11   assignment.

12   To the family members and those that know
13   Mr. Valdez, I'm sorry that this day has come.

14   I do want all of you to know that, based upon what
15   I have heard and read, that you tried your level best to
16   create an environment in which the Valdez children lived
17   lawful, fulfilled lives, in which they could be happy in
18   their relationships with their family and with their
19   communities.

20   The fact that there are two people that are in law
21   enforcement that are a brother and sister is a remarkable
22   testament to how hard your family has operated and how well
23   you have protected yourself from a member of your family who
24   has done despicable things.

25   That's your hope.  You have each other to lean on,

1   you have each other to support you, you have jobs in which
2   you continue to make an influence within your communities,
3   and know that you are in no way responsible, considering what
4   you tried to do, for the decisions made with a member of your
5   family.

6          For those that are otherwise here to support
7   Mr. Valdez, I have tried to explain throughout this hearing
8   what my perspective is, having served in law enforcement
9   myself and having been on the bench for fourteen years, that
10  I have never seen a case like this, and it shows me that
11  there is plenty of work that needs to be done to stop this.

12         It's ruining our country, it's ruining people, and
13  those people that want to do the ruinous behavior that causes
14  that, they should know today that what happens to you is
15  indeed ruinous, because we just won't tolerate it.  So thank
16  you for your attention.

17         Is there anything else I need to cover?
18         MS. HATHAWAY:  No, Your Honor.  Thank you.
19         THE COURT:  Is there anything else, Mr. Parker?
20         MR. PARKER:  No, Your Honor.
21         THE COURT:  We will be in recess.
22            (Proceedings adjourn at 12:33 p.m.)
23
24
25

1          C E R T I F I C A T E

2

3     UNITED STATES OF AMERICA        :
                                      :
4     NORTHERN DISTRICT OF GEORGIA    :

5
               I, Nicholas A. Marrone, RMR, CRR, Official Court
6
      Reporter of the United States District Court for the Northern
7
      District of Georgia, do hereby certify that the foregoing 111
8
      pages constitute a true transcript of proceedings had before
9
      the said Court, held in the city of Atlanta, Georgia, in the
10
      matter therein stated.
11
               In testimony whereof, I hereunto set my hand on
12
      this, the 19th day of June, 2018.
13

14

15

16

17          _____
            NICHOLAS A. MARRONE, RMR, CRR
18          Registered Merit Reporter
            Certified Realtime Reporter
19          Official Court Reporter
            Northern District of Georgia
20

21

22

23

24

25